IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
December 17, 2013 Session

**STATE OF TENNESSEE v. THOMAS LEE HUTCHISON**

**Appeal from the Criminal Court for Knox County**
**No. 88264      Jon Kerry Blackwood, Judge**

**No. E2012-02671-CCA-R3-CD - Filed April 11, 2014**

A Knox County jury convicted appellant of three counts of facilitation of first degree murder and one count of facilitation of especially aggravated robbery. The trial court merged the facilitation of first degree murder convictions and sentenced appellant to seventeen years. The trial court also sentenced appellant to a concurrent sentence of eight years for facilitation of especially aggravated robbery. On appeal, appellant presents thirteen issues for our review: (1) whether the trial court erred in overruling appellant's motion to suppress evidence seized in an extended warrantless search of his house; (2) whether the trial court erred in allowing the State to introduce video footage of the crime scene; (3) whether the trial court erred in allowing the State to introduce evidence of blood samples taken from appellant without a warrant; (4) whether the trial court erred in admitting prior bad act evidence; (5) whether the trial court erred by allowing testimony regarding evidence that had been destroyed; (6) whether the trial court erred by allowing a medical examiner to testify about an autopsy performed by another medical examiner; (7) whether the trial court erred in denying appellant's three motions for mistrial based on prosecutorial misconduct; (8) whether the trial court erred when it denied appellant's request for a continuance in light of the State's late disclosure of certain evidence; (9) whether the trial court erred by denying appellant's request to strike a witness's testimony when the testimony was internally contradictory; (10) whether the trial court erred by allowing the State to introduce graphic photographs of the victim's injuries; (11) whether the trial court erred in its jury instructions; (12) whether the evidence was sufficient to support appellant's convictions; and (13) whether appellant is entitled to a new trial due to cumulative error. Based on our thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which NORMA MCGEE OGLE, J., joined. JOSEPH M. TIPTON, P.J., filed a separate opinion, concurring in part and dissenting in part.

Robert L. Jolley, Jr., and Megan A. Swain, Knoxville, Tennessee, for the appellant, Thomas Lee Hutchison.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilbur, Assistant Attorney General; Randall Eugene Nichols, District Attorney General; and Ta Kisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

I. Facts

This case concerns the February 19, 2002 murder and robbery of the victim, Gary Lindsey. The victim was killed in appellant's home, and the police arrested appellant for the crime. On December 11, 2007, a Knox County grand jury indicted appellant for premeditated murder, murder in the perpetration of robbery, murder in the perpetration of theft, and especially aggravated robbery. Prior to trial, appellant moved the court, in separate pleadings, to suppress blood evidence taken from appellant without a warrant and to suppress all evidence seized from appellant's house during a warrantless search. The trial court denied both motions. On or around November 19, 2010, the State notified appellant that physical evidence in his case had been inadvertently destroyed by the Knoxville Police Department ("KPD"). Consequently, appellant moved the court to dismiss the indictment based on the destruction of evidence. The trial court heard appellant's motion to dismiss the indictment on February 25, 2011, and subsequently denied the motion. On May 27, 2011, appellant filed a motion requesting that the trial court reconsider the previously filed motions to suppress evidence. The trial court granted the motion to reconsider but ultimately denied the motions to suppress by written order filed July 13, 2011. The matter proceeded to trial on August 8, 2011, and the jury found appellant guilty of three counts of the lesser included offense of facilitation of first degree murder and one count of the lesser included offense of facilitation of especially aggravated robbery.

A. Motions to Suppress Hearing

The trial court heard arguments and testimony regarding both motions to suppress during the same hearing. At the hearing, Michael Mays testified that he was the records specialist for the Knox County Emergency Communications District. According to Mr. Mays, the 9-1-1 system received a call regarding a shooting at 1:21 a.m. on February 20, 2002, at appellant's residence. The complainant was Gene Mitchell. The first officer arrived at the scene at 1:23 a.m., and another officer arrived at 1:28 a.m. Detectives from the Major Crimes unit arrived at 1:37 a.m., and the crime scene investigators arrived at 1:39 a.m. A person was transported to the University of Tennessee Medical Center emergency room,

accompanied by a Major Crimes detective and an officer, at 1:46 a.m. At 2:56 a.m., University of Tennessee police were called for a blood alcohol test kit. Mr. Mays said that the majority of the police began leaving the crime scene around 4:00 a.m. On cross-examination, Mr. Mays clarified that the records did not indicate that a person was transported to the emergency room, only that a detective and an officer went there at 1:46 a.m. In addition, he said that the last crime scene officer left the scene at 8:49 a.m.[1]

KPD Officer Joshua Shaffer testified that he received a call about a shooting on Millertown Pike on February 20, 2002. He had just driven by the location, so he turned around to find the address. A vehicle attempting to exit a driveway at a high rate of speed caught his attention, and he blocked the vehicle in the driveway. The driver exited and screamed, "'He's inside.'" Officer Shaffer then saw two men exiting the house. He gathered the three men into the carport of the house. The men were frantic and kept saying, "'Inside.'" Officer Shaffer entered the house and observed appellant sitting on the floor. Appellant had blood on his head and upper body. Officer Shaffer also saw a broken fireplace poker on the floor that had blood on it. The other three men re-entered the house and began yelling at appellant. Officer Shaffer asked another officer who had arrived to escort the men out. As they were leaving, they pointed toward a specific room and said, "'He's in there.'" Officer Shaffer entered the room via a small set of stairs. He noted that it was not possible to see the floor of the room until one reached the top of the stairs. Once he could see the floor, he observed a body lying face down on the floor with significant injuries. Officer Shaffer testified that it was clear from the injuries that the person was deceased, so he briefly checked the room to assess whether anyone else was there, then exited.

Thereafter, Officer Shaffer stayed with appellant while medical personnel treated him at the house, and then he accompanied appellant to the hospital in the ambulance. Officer Shaffer testified that his purpose was to take any potential evidence, such as appellant's clothing, into possession immediately if he had the opportunity, and he did, in fact, take possession of appellant's clothing. Officer Shaffer further testified that he observed blood and "tissue type items" on appellant's pants. He said that at the time, he was not able to affirmatively identify the tissue, but he connected it with the victim's head trauma. While at the hospital, Officer Shaffer asked the hospital staff to take a sample of appellant's blood for a drug and alcohol screening.

On cross-examination, Officer Shaffer testified that the first time he recalled seeing handcuffs on appellant was in the ambulance. He further testified that he did not have a search warrant for appellant's house and that he did not have a resident's consent to search.

---

[1] We note that other witnesses provided slightly different times; however, with the differences being inconsequential, for purposes of this opinion, we will rely on the times provided by Mr. Mays.

Officer Shaffer confirmed that at the time he requested the blood sample, he did not have any information about drug or alcohol use at appellant's residence.

KPD employee Janice Gangwer testified that she was a forensic specialist in 2002. She responded to the scene of the victim's homicide on February 20, 2002. She videotaped the scene prior to any collection of evidence. The State played the crime scene video while Ms. Gangwer narrated. Ms. Gangwer also detailed the evidence collected from the scene and evidence collected by Officer Shaffer (appellant's clothing and blood sample) that he turned over to her. She testified that she was at the scene from 1:41 a.m. until 6:00 a.m.

On cross-examination, Ms. Gangwer testified that the victim's body was removed from the crime scene around 5:30 a.m. She agreed that nothing occurred over the course of the time she was at the scene that would have destroyed evidence. Ms. Gangwer testified that she collected blood, swabs of appellant's hands, and fingernail clippings from appellant pursuant to a search warrant. On re-direct examination, Ms. Gangwer testified that the crime scene log indicated that the victim's body was removed at 5:00 a.m.

The trial court ultimately denied appellant's motions to suppress, and it reaffirmed this decision after reconsidering the motion. The trial court concluded that Officer Shaffer's entry into appellant's house was under exigent circumstances and that the crime scene unit's entry was an extension of Officer Shaffer's entry. The trial court further concluded that the officers were justified in seizing evidence under the plain view doctrine. Finally, the trial court concluded that the seizure of appellant's blood by Officer Shaffer was reasonable because Officer Shaffer had probable cause to believe a crime had been committed. The trial court reasoned that analysis of appellant's blood would be critical evidence, considering the blood spatters found in his house and the blows he had received.

### B. Motion to Dismiss Indictment Hearing

On November 24, 2010, appellant moved to dismiss the indictment based on the State's negligent destruction of material, exculpatory evidence. In the motion, appellant alleged that the State had notified appellant's counsel on November 19, 2010, that all evidence in his case had been destroyed. The trial court held a hearing on the motion on February 25, 2011.

At the hearing, the prosecutor reviewed the history of the case and explained that the evidence in the case was stored on State Street. The case was scheduled for trial in August 2010, so the prosecutor called KPD and asked that the evidence be pulled so that she and appellant's counsel could review it. The attorneys ultimately did not view the evidence then because the case was continued. When they began preparing for trial again, the State's

-4-

attorney called KPD, and KPD informed her that they could not locate the evidence. The State's attorney explained KPD's general procedure for destroying evidence: KPD obtains a court order to destroy evidence and then places evidence on pallets outside to be picked up and taken to a landfill. KPD suspected that the evidence in appellant's case was inadvertently taken to the landfill along with evidence tagged for destruction.

Appellant's counsel argued that while photographs of much of the evidence existed, no photographs existed of appellant's shirt and jacket, which were seized by Officer Shaffer at the hospital. Counsel further argued that the items were exculpatory because the crime laboratory had determined that only appellant's blood was on the items. Counsel also posited that the destruction of the evidence prevented appellant from presenting a defense that the murder was committed by another person or was committed in self-defense. In addition, counsel stated that the destruction of a gold nugget ring prevented the jury from contrasting that ring with the ring removed from the victim during the autopsy and that it impeded witnesses from identifying whether the rings were typically worn by the victim. Counsel argued that a chain of custody issue arose due to the destruction because the chain of custody documentation was marked on each individual item. Counsel contended that appellant was left with no way to preserve the issue of appellant's blood samples because the samples were destroyed and that appellant no longer had any way to collect fingerprints or test any of the items, such as the crack cocaine found on the victim's person and in appellant's house. Finally, counsel pointed out that there was no destruction order in this case and no documentation of any removal of the evidence from storage after April 2009.

The State responded that the case was not limited to physical evidence because there were also laboratory reports, photographs, and testimony from witnesses and investigators. The State contended that the evidence was inculpatory, as shown in part by appellant's motion to suppress all of the evidence, rather than exculpatory. The State also noted that appellant had never asked to test any of the evidentiary items prior to being notified of their destruction.

In its order denying appellant's motion to dismiss, the trial court concluded that the destroyed evidence had some exculpatory value. The State had conceded that it had a duty to preserve the evidence, and the court determined that the destruction of the evidence was simple negligence. In making that determination, the trial court focused on several factors: (1) no motion was made for additional testing of the evidence between 2002 and 2009; (2) when additional testing was performed in 2009, "no mention was made of its exculpatory nature until it was destroyed"; (3) the KPD stored the evidence according to protocol for many years but negligently failed to return it to its original place; and (4) the KPD accidentally destroyed the evidence. The court stated that it had reviewed the exhibits filed in the case and that it determined that the probative value of the evidence was not significant

because any "[f]urther testing would be speculative" and because the evidence would have shown "what would be uncontroverted at trial." The court further determined that the photographs of the evidence alongside photographs of the crime scene were reliable and provided appellant an adequate opportunity to present a defense. The court ruled that the destruction of the evidence did not deprive appellant of a fair and impartial trial and thus denied appellant's motion to dismiss the indictment.

### C. Motion to Dismiss and Motion for a Continuance

During a pre-trial motion hearing on August 8, 2009, appellant renewed his motion to dismiss the indictment and moved for a continuance. The continuance motion was based on his having received from the State on August 5, 2009, two photographs, which purported to be of appellant's clothing. In addition, appellant complained that he had not received from the State a statement made to the police by witness John Mitchell. The State responded that appellant had recently requested photographs from the Tennessee Bureau of Investigation ("TBI"). The State contacted the TBI, and Agent Keith Proctor sent the State two photographs, which it then sent to appellant. The photographs were of appellant's clothing that had been tested by the TBI, specifically a jacket and shirt. The State noted that these clothing items were the same ones appellant had listed at a prior motion hearing as items of which he did not have photographs following the destruction of the evidence. Regarding John Mitchell's statement, the State said that it did not have a copy of the statement but that the police investigative action report detailed what each witness told the police. The State contended that appellant would be able to potentially impeach John Mitchell with the action report. The trial court denied appellant's motions.

### D. Trial

Michael Mays, the custodian of records at the Knox County Emergency Communications District 9-1-1 ("E-9-1-1"), explained that recordings of 9-1-1 calls were only kept for fifteen months but that calls and dispatch reports were also logged into the computer-aided dispatch ("CAD") system. The State introduced a CAD report, dated February 20, 2002, into evidence and asked Mr. Mays to explain the report. Mr. Mays testified that according to the report, E-9-1-1 received a call from Gene Mitchell at 1:19 a.m. The dispatcher noted on the report that she had difficulty understanding the complainant (Gene Mitchell) but that the complainant reported that someone had been killed and that "'they [were] holding a suspect.'" The remainder of Mr. Mays' testimony was consistent with his testimony during the motion to suppress hearing, with two notable exceptions. He added that a description of witness Penny Cox was entered at 2:56 a.m. and that the report noted that officers had called area taxi cab companies to determine whether Ms. Cox had taken a cab.

-6-

KPD Officer Joshua Shaffer testified consistently with his testimony at the motion to suppress hearing. Officer Shaffer was the first officer to arrive and encountered three men outside of appellant's home. He entered appellant's home and observed appellant, who was sitting in the living room and obviously injured. Officer Shaffer found the victim's body. He testified that it was immediately apparent that the victim was deceased. Officer Shaffer accompanied appellant to the hospital and collected his clothing. Officer Shaffer also had the hospital staff take a blood sample from appellant. He said that he requested the blood sample to determine whether the blood at the scene and on appellant belonged to appellant or the victim.

In addition to the testimony previously given, Officer Shaffer testified that he had been involved in drug investigations and had learned that people often hid drugs in their pockets, in the lining of their waistbands, or in their underwear. He further testified that when he found the victim, the victim's pants had been pulled down around his knees. Officer Shaffer said that people who are high on crack cocaine are generally agitated or excited. When he found appellant, appellant was "disoriented, dazed, confused[,] . . . the other end of the spectrum" from someone who had just smoked crack cocaine. Officer Shaffer testified that appellant's behavior was more consistent with someone "coming off of a high" or at "the end phase" of a high.

On cross-examination, Officer Shaffer testified that the victim's body was not covered when he first saw it. He further testified that all of appellant's clothing had been placed in a single bag by a hospital employee.

Melanie Carlisle, a forensic scientist with the TBI, testified that she tested appellant's blood using the sample taken at 3:23 a.m. on February 20, 2002. She found less than .25 micrograms per milliliter of cocaine in his blood. She further testified that based on the half-life of cocaine, appellant would have ingested cocaine three hours before the blood sample was taken.

KPD crime scene technician Janice Gangwer testified that she processed the scene at appellant's house. She first videotaped the scene, beginning outside the house and walking through the house. The State played the video for the jury as Ms. Gangwer narrated. Also through Ms. Gangwer's testimony, the State introduced photographs of the crime scene; appellant, as he appeared at the hospital; and Penny Cox, as she appeared while at the police station. Ms. Gangwer and her partner, Gerald Smith, collected evidence from the house, including a knife handle with a broken blade; 0.27 grams of crack cocaine; a crack pipe; a crowbar with blood, hair, and brain matter on it; a shirt; a jacket; and a "gold nugget ring" with blood on it from the bathroom counter.

Ms. Gangwer testified that she also collected swabs of appellant's hands, head, and right foot, as well as his fingernail clippings. She observed while a nurse drew appellant's blood, and then she transported his blood and the other items to the property unit. Ms. Gangwer submitted to the TBI all the samples she had taken, appellant's blood, samples from appellant's clothing, and blood and hair samples from the victim. Ms. Gangwer testified that she and Mr. Smith tested various items in the house for fingerprints, including the knife handle and the crowbar. They were unable to obtain useful fingerprints from either item because the knife handle was covered in blood and the surface of the crowbar was too rough.

Penny Cox testified that she met appellant through John "J.B." Mitchell. She met the victim through Mr. Mitchell's family. Ms. Cox said that the first day she went to appellant's house, Mr. Mitchell and the victim were also there. The following day, she was again at appellant's house along with Mr. Mitchell and the victim, and they played a card game together. Ms. Cox testified that during the game, appellant asked the victim for crack cocaine. The victim responded by calling appellant a "dumb a**." Ms. Cox said that she was at appellant's house the day after the card game and that she planned to rent a room from appellant. That day, appellant told her that he did not like the victim and that he planned to rob the victim. Appellant did not tell her his plan, however.

Ms. Cox testified that she overheard appellant talking on the telephone with a person she assumed was the victim. Appellant told the victim that he knew a doctor who wanted to buy crack cocaine. Subsequently, the victim and Mr. Mitchell arrived at appellant's house. Ms. Cox stayed in the bedroom she planned to rent, but she managed to overhear their conversation. The men discussed setting up a drug deal with the doctor, and appellant said that he did not want anyone else in the house other than Ms. Cox, who would stay in her bedroom. Mr. Mitchell and the victim left appellant's house and later returned with a pizza. They went directly to the upstairs bedroom. Mr. Mitchell came back downstairs and smoked crack with Ms. Cox in her bedroom. After Mr. Mitchell left the house, Ms. Cox fell asleep.

Ms. Cox testified that she was awakened by the sound of loud thumps. Ms. Cox emerged from her bedroom and saw appellant exiting the upstairs bedroom. She stated that she thought she saw the victim's body on the floor in the upstairs bedroom before appellant closed the door. Ms. Cox described appellant as having blood on his hands and said he was "wild looking." Appellant told Ms. Cox that he had killed the victim with a knife. She said that he looked out all the windows and turned off the lights. Appellant would not allow her to leave or check on the victim. Ms. Cox testified that he asked her to help him dispose of the body: "He said that he wanted to chop [the victim] up and burn him in the fireplace or take him out back to a nursery and bury him." She refused to help him. Ms. Cox said that they smoked crack together and that he allowed her to call a friend, "Kim," to pick her up.

-8-

Ms. Cox testified that Kim picked her up and that they went to Kim's apartment. Ms. Cox told Kim what appellant had done, and Kim took her to "George['s]" house on "Tacoma." While at George's house, Ms. Cox called Mr. Mitchell's father, Gene Mitchell, II, and told him that appellant had killed the victim. She was taken by the police to the police station the next day, where they interviewed her for several hours. Ms. Cox testified that she had not changed clothes or showered in the interim between leaving appellant's house and arriving at the police station. She said that she did not have any blood or brain matter on her. Ms. Cox denied stabbing, bludgeoning, or even touching the victim. She further testified that she had been cooperative with the investigation and that at the time of trial, she no longer used cocaine.

On cross-examination, Ms. Cox testified that during a jury-out hearing, she had mistakenly said that the victim was the person who did not want anyone else in the house during the drug deal with the doctor. She said that she did not remember telling the police that appellant had not been angry with the victim. She also did not remember testifying at an October 2007 hearing that she had not smoked cocaine the evening of the murder. Ms. Cox admitted that she had a physical relationship with both Mr. Mitchell and the victim.

TBI special agent forensic scientist Margaret Bash testified that in 2002, she worked in the serology unit. Agent Bash tested two areas of appellant's blue jeans, the left pocket and the ankle area, against samples of appellant's blood and the victim's blood. Blood from the pocket matched appellant's, and blood from the ankle area matched the victim's. She also tested appellant's socks and determined that the blood on those was the victim's. On cross-examination, Agent Bash testified that she did not recall what area of appellant's socks she tested.

Gerald Smith testified that in 2002, he was a crime scene technician with the KPD. Mr. Smith described the scene in the room where the victim was found: The victim was lying face down on the floor, and there was blood spatter around the victim, up the walls, and on items nearby. He noted that some items in the room did not have blood spatter but were on top of items that did have blood spatter, which he interpreted to mean that "[t]here had been some covering up of some of the spatter." Mr. Smith explained that he and Ms. Gangwer attempted to reveal the scene as it had been "at the time that [the] force was applied to [the] blood source," which they did by removing layers of items and examining each layer individually. Mr. Smith testified that he measured the victim's head wound and described the wound as the source of the spattered blood. The State moved into evidence a photograph depicting Mr. Smith's measurement of the head wound, as well as several photographs of items found at the scene that illustrated the blood spatter. Mr. Smith opined that based on the blood spatter patterns, the victim was already prone on the carpet when he received "the majority of the blows." Mr. Smith testified that he attended the victim's autopsy. He brought

the crowbar and the knife handle found at the scene to the autopsy at the medical examiner's request. He said that the autopsy revealed that the victim had two stab wounds to his back and that the knife blade was still in his back. Mr. Smith collected the victim's clothing, the knife blade, a bag of marijuana found in the victim's shirt, and a crack rock found in the victim's sock.

John Bolton "J.B." Mitchell testified that he knew both appellant and the victim. He called the victim one of his best friends and stated that he knew appellant through his father, Eugene "Gene" Mitchell. Mr. Mitchell testified that appellant met the victim through the Mitchell family. He said that the victim occasionally brought food to appellant when appellant was hungry. Mr. Mitchell stated that he knew Penny Cox through his father. Mr. Mitchell testified that in the days leading up to the victim's death, he took Ms. Cox to appellant's house, where they used crack cocaine together. He would come by appellant's house whenever Ms. Cox called him to buy more crack cocaine.

On February 19, 2002, Mr. Mitchell used cocaine with Ms. Cox at appellant's house and gave Ms. Cox and appellant each $20 worth of crack cocaine. He used Ms. Cox's car that day to drive around making drug sales. Around 8:30 or 9:00 p.m., Mr. Mitchell gave the victim a ride to appellant's house. He said that when they arrived, appellant asked Mr. Mitchell why he had accompanied the victim, and Mr. Mitchell explained that the victim's car was broken down. Mr. Mitchell observed that doors were open in appellant's house that he had never seen open before. When he questioned appellant about it, appellant said that his friend, to whom the men planned to sell drugs, had run away because he was worried about being robbed. Mr. Mitchell testified that appellant was acting strangely during this time and that as a result of appellant's behavior, Mr. Mitchell warned the victim not to go through with the sale. The victim ordered a pizza, and the three men waited for the pizza and for the buyer to return. Appellant pressured Mr. Mitchell to leave the house, which he eventually did. Before Mr. Mitchell left, he told the victim to call him when he was ready to leave.

Mr. Mitchell testified that the victim never called him. Mr. Mitchell called appellant to ask about the victim's whereabouts, and appellant told him that the victim had left. Appellant also asked Mr. Mitchell to bring him $40 worth of crack cocaine. Mr. Mitchell and his brother went to appellant's house to sell him the cocaine around 1:00 a.m., and they saw their father along the way, waving at them and looking "hysterical." When they arrived at appellant's house, appellant came outside, and they began discussing the drug deal. Mr. Mitchell's father arrived at that point and said that Ms. Cox had told him that appellant had stabbed the victim. Mr. Mitchell ran inside and found the deceased victim in the upstairs room. Mr. Mitchell said that the victim was wrapped in a blanket with a crowbar lying on top of him and that "[h]e had no brains in his head." Mr. Mitchell unwrapped the victim and

prayed for his soul. He then "went out there to get" appellant. Appellant tried to run, but Mr. Mitchell stopped him and beat him. He and his family took appellant back inside appellant's house. Mr. Mitchell dialed 9-1-1 and handed the telephone to his father. He continued to beat appellant and asked him why he killed the victim. Appellant responded, "I didn't do it by myself." Appellant would not say who else was involved, however. When the police arrived, Mr. Mitchell went with them for questioning.

Mr. Mitchell testified that prior to his death, the victim had $2,000 in cash, marijuana, and "a lot" of crack cocaine. The State showed Mr. Mitchell a photograph of the cocaine found in the victim's sock after his death, and Mr. Mitchell said that the victim had "way more" than that amount before his death. Mr. Mitchell identified the nugget ring found in the upstairs bathroom as the victim's, explaining that he was with the victim when he bought the ring. Mr. Mitchell further explained that the victim customarily wore two rings on one hand. Mr. Mitchell testified that the crowbar found with the victim was usually propped up beside appellant's front door. Mr. Mitchell denied harming or robbing the victim.

On cross-examination, Mr. Mitchell testified that his father was on the telephone with 9-1-1 while Mr. Mitchell was beating appellant. He supposed that 9-1-1 was recording any statements made at that time. Mr. Mitchell said that he could not tell whether appellant was bloody when he came outside because it was dark. Mr. Mitchell testified that Ms. Cox had been at appellant's house for one and a half to two days before the victim's death. He said that he thought appellant's house would be a safe place for her to "get high," where she would not have to worry about being robbed. Mr. Mitchell agreed that he had a physical relationship with Ms. Cox. He said that he never played cards with Ms. Cox, appellant, and the victim. Mr. Mitchell testified that the victim ordered the pizza to be delivered; he did not leave to pick one up. Mr. Mitchell recalled that he spoke to Ms. Cox before he left appellant's house and told her to call him when the drug deal was complete. He agreed that he was driving Ms. Cox's car and said that Ms. Cox knew he used the car to make drug sales, not to fix a broken taillight. Mr. Mitchell testified that he talked to Ms. Cox about the victim's death several times because he "was mad at her" and "thought she might have had something to do with it." Mr. Mitchell said that he did not leave the house to meet the police outside; he stayed inside to continue restraining appellant.

TBI special agent forensic scientist Keith Proctor testified that on March 2, 2009, he received a request from Gerald Smith to test certain items, including a blue sweatshirt, two jackets, white shoes, a knife handle, a cellular telephone, a ring, a carpet sample, a crowbar, swabs from appellant's hands, and clippings from appellant's fingernails. He was also given blood standards from appellant and the victim. Agent Proctor found both appellant's and the victim's blood on the finger swabs and fingernail clippings from appellant's right hand, with appellant being the major contributor and the victim being the minor contributor. Only

-11-

appellant's blood was located on the swabs and fingernail clippings from appellant's left hand. Human blood was located on appellant's foot swab, but the DNA was insufficient or degraded. Agent Proctor tested a blue shirt and found it to be positive for appellant's blood. A maroon jacket likewise tested positive for appellant's blood. Appellant's blood was found on his white shoes, but other areas on the shoes provided inconclusive results due to degraded or insufficient DNA. Agent Proctor found the victim's blood on the knife handle and the crowbar.

On cross-examination, Agent Proctor testified that he did not test the cellular telephone because he did not deem it necessary. He also did not examine the ring or carpet sample.

KPD Officer Bob Solomon testified that he worked in the property unit. He recalled that the evidence in appellant's case was originally stored at the police department but that it was moved to an offsite storage location due to the age of the case. He testified that he received a call from the prosecutor requesting to view the evidence prior to the trial date. Officer Solomon said that the evidence was moved to a shelf near the door. The evidence stayed there even after the property unit learned that the case had been continued. At some point, the property unit realized that the evidence was missing. Teams of officers searched the storage facility for the evidence. Officer Solomon estimated that they searched twenty times but were unable to find it. He testified that the police department's policy was to only destroy evidence upon a court order. He did not recall whether there were any destruction orders issued for any property stored in the same facility as the evidence in the instant case.

On cross-examination, Officer Solomon testified that only three officers had access to the storage site. He further testified that any evidence set for destruction would be checked against a list of cases for which there were court orders for destruction. Officer Solomon agreed that there was no indication that the evidence in appellant's case was mistakenly destroyed.

Former KPD Investigator Jim Murray testified that he worked in the major crimes division in 2002. He responded to appellant's address on February 20, 2002, at approximately 1:40 a.m. Investigator Murray testified that he and fellow investigators received a briefing from the responding officers, after which he and another investigator began processing the crime scene. Another investigator returned to the police department to question the Mitchells. Investigator Murray testified that he observed a knife handle in the room with the victim's body and that similar knives were found in the kitchen. He noticed that the victim was wearing one gold ring and that another finger had an area void of blood, which led Investigator Murray to believe that the victim had been wearing a second ring. Investigator Murray found a ring on the vanity in the upstairs bathroom.

-12-

Investigator Murray further testified that he went to the hospital to see appellant. He observed blood on appellant's hands, so he obtained a search warrant to collect samples therefrom. Investigator Murray said that while he was waiting for the search warrant, the police were trying to locate a witness, Penny Cox. Later that day, he received a notification that Ms. Cox had been found and was being brought to the police station.

Investigator Murray testified that he met with Ms. Cox and informed her of her constitutional rights. She agreed to waive her rights and gave a statement. Investigator Murray described her interview as "forthcoming." She told him that she had been at appellant's house for three days and that appellant had told her he did not like the victim because of the way the victim spoke to him when they played cards. Ms. Cox elaborated by saying that the victim called appellant a "bum" because he always needed money. Ms. Cox told Investigator Murray that appellant said he knew how he could rob the victim. She said that the victim came to appellant's house with John Mitchell and that John Mitchell left the house. Ms. Cox informed Investigator Murray that one to one and a half hours later, she heard ten thuds. She observed appellant exiting the upstairs room and thought that she saw the victim's body on the floor. Appellant told her, "'It's done,'" and said that he had killed the victim by stabbing him. Ms. Cox told Investigator Murray that appellant was acting strangely and had blood on his hands. She reported that appellant asked her to help him dispose of the victim's body but that she refused. She further reported that appellant suggested he could dispose of the body by either burning it in the fireplace or burying it in a pile of mulch. Ms. Cox told Investigator Murray that she and appellant smoked crack cocaine that "she believed [appellant] had taken off of [the victim]." Appellant also gave her over $100 even though he had not had money earlier in the day. Ms. Cox related to Investigator Murray that she was eventually able to call a friend to pick her up. She reported that she told her friend what had happened and that her friend took her to someone else's house. Ms. Cox contacted Eugene Mitchell and told him that appellant had killed the victim. She told Investigator Murray that she had not contacted the police because she was afraid of appellant. She said that she had not changed clothes since the previous day.

On cross-examination, Investigator Murray testified that the interview with Ms. Cox was recorded and later transcribed. A copy of the transcription was placed in the police files, and the recording was placed into evidence. Investigator Murray agreed that Ms. Cox told him she did not know appellant's last name. She did not mention John Mitchell at all until she told Investigator Murray that Mr. Mitchell had taken her car to have its taillight repaired. She later told him that Mr. Mitchell had arrived at appellant's house with the victim when earlier she had said that the victim had been alone. Ms. Cox did not tell Investigator Murray about smoking crack cocaine with appellant, but she did tell him that she had smoked with Mr. Mitchell the day before. Investigator Murray agreed that the transcription of the

-13-

interview did not reflect that Ms. Cox told him about smoking crack cocaine with appellant or his giving her over $100.

Investigator Murray further testified that Investigator Sam Brown had interviewed at least two members of the Mitchell family, John Mitchell's father and brother. Investigator Murray incorporated Investigator Brown's summary of the interviews into his investigative action report. He opined that if either of the Mitchells had mentioned that appellant told them that he did not kill the victim by himself, that information would have been included in the summary. Likewise, if anyone had said that the murder was the result of a drug deal gone awry, that statement would have been included in the summary. Investigator Murray did not have any knowledge of statements made by John Mitchell.

Dr. Darinka Mileusnic-Polchan, the Chief Medical Examiner for Knox County, testified as an expert in forensic and anatomical pathology. She further testified that the victim's autopsy in this case was performed by Dr. Sandra Elkins. Dr. Mileusnic-Polchan said that she reviewed photographs taken during the autopsy and the autopsy report prepared by Dr. Elkins. Dr. Mileusnic-Polchan opined that the major cause of the victim's death was the blunt force trauma injury to his skull and brain; the minor cause of his death was the two stab wounds to his back; and the manner of his death was homicide. She noted that the victim received multiple strikes to his head. According to Dr. Mileusnic-Polchan, photographs introduced through her testimony demonstrated how the crowbar found at the scene matched the injury pattern. She testified that one of the stab wounds penetrated the right lung and that the other penetrated the left lung and heart. The knife blade remained in the stab wound on the victim's left side. The victim did not have a "classic defense injury," indicating that he was not involved in fighting nor was he trying to protect himself, but he did have one bruise on his right hand. Dr. Mileusnic-Polchan testified that her findings and conclusions were consistent with the victim's being stabbed in the back while in a seated position and then being bludgeoned with a crowbar while lying prone on carpet or a rough surface.

On cross-examination, Dr. Mileusnic-Polchan testified that she was unable to determine time of death because the facts necessary to calculate time of death were not available to her. She further testified that the sharp force and blunt force injuries occurred near-simultaneously but that she could not say which preceded the other. She agreed that it was possible that the victim was held by one person while another inflicted the injuries. Dr. Mileusnic-Polchan opined that any adult, male or female, might have inflicted the stab wounds but that she believed the head trauma would have been inflicted by a male. She based her conclusion regarding the head trauma on her personal experiences, having never seen a female inflict such trauma on a male victim. Following Dr. Mileusnic-Polchan's testimony, the State rested its case.

-14-

The defense called KPD Investigator Sam Brown as a witness. He recalled meeting three black males at appellant's house when he responded to the crime scene. He further recalled interviewing all three subjects at the police department and recording their statements. Investigator Brown testified that Eugene Mitchell, Jr., John Mitchell's father, told Investigator Brown that he received a telephone call from "Penny" at "four." Investigator Brown opined that Eugene Mitchell, Jr., meant either 4:00 p.m. or 4:00 a.m. the previous day, considering that his statement was taken at 2:50 a.m. Investigator Brown agreed that if anyone had told him that appellant had made a statement indicating he had killed the victim or that the victim was killed as part of a crack cocaine deal, he would have shared that information with Investigator Murray. Investigator Brown stated that he had never seen a transcription of the interview he conducted with John Mitchell.

On cross-examination, Investigator Brown testified that if he had seen any blood or brain matter on any of the Mitchells' clothes or skin, he would have confiscated their clothing or processed their skin for evidence. He said that he did not see any such matter on any of the Mitchells and that the interview room where he met with them was very small. Investigator Brown testified that Investigator Murray had a respected reputation for truth and veracity in the community.

Kimberly Armas-Trejo testified that on February 19, 2002, she received four telephone calls from Penny Cox asking her to pick up Ms. Cox at a house near East Towne Mall. The telephone calls began around 8:00 p.m. Ms. Armas-Trejo said that she picked up Ms. Cox at either 10:00 p.m. or 11:00 p.m. Defense counsel showed Ms. Armas-Trejo a picture of Ms. Cox taken at the police station and asked whether the clothes she was wearing were the same clothes she was wearing when Ms. Armas-Trejo picked her up. Ms. Armas-Trejo said that they were not the same clothes. Ms. Armas-Trejo testified that Ms. Cox paid her $20 for the ride. She further testified that Ms. Cox had more cash than she typically had and that she had crack cocaine. She said that she did not see any blood on Ms. Cox but that it was dark. According to Ms. Armas-Trejo, Ms. Cox was acting strangely, so she questioned her. Ms. Cox told her that the victim was dead and that appellant had "'beat him in the head with a hammer and covered him up with a sheet.'" Ms. Armas-Trejo was not willing to take Ms. Cox to her own home, so she drove Ms. Cox to another person's house. When Ms. Armas-Trejo heard on the news that the police were looking for Ms. Cox, she called them and informed them of Ms. Cox's location.

On cross-examination, Ms. Armas-Trejo testified that she did not recall telling the police that Ms. Cox told her that appellant had stabbed the victim, that she had seen him come downstairs with blood on his hands, or that she was scared of appellant. On redirect examination, Ms. Armas-Trejo testified that the State had paid for her to travel to Nashville and for a hotel room but that the State stopped contacting her and did not offer to pay for

additional nights at the hotel after she gave them the information about which she had just testified.

Following the close of proof and deliberations, the jury found appellant guilty of three counts of the lesser included offense of facilitation of first degree murder and one count of facilitation of especially aggravated robbery. The trial court merged the facilitation of first murder convictions and sentenced appellant to seventeen years. The trial court also sentenced appellant to a concurrent sentence of eight years for facilitation of especially aggravated robbery. This appeal follows.

## II. Analysis

### A. Motion to Suppress Physical Evidence

Appellant's first argument centers on what he terms the "extended warrantless 'crime scene' search of his house." He contends that the search of his home and the seizure of evidence therein went far beyond the scope of any exigent circumstances justifying the first responding officer's entry into his home and that the evidence should have been suppressed. The State responds that exigent circumstances justified the first officer's entry, that the entry of subsequent officers was merely an extension of the first officer's entry, and that the seizure of evidence was justified under the plain view doctrine. In the alternative, the State contends that if this court concludes that the evidence was illegally seized, the inevitable discovery doctrine would nonetheless allow its admission at trial.

A trial court's findings of fact at a hearing on a motion to suppress are binding upon this court unless the evidence contained in the record preponderates against them. *State v. Ross*, 49 S.W.3d 833, 839 (Tenn. 2001). As the trier of fact, the trial court is in a better position to assess the witnesses' credibility, determine the weight of the evidence and the value to be afforded it, and resolve any conflicts in the evidence. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). However, the trial court's conclusions of law are not binding on this court. *State v. Randolph*, 74 S.W.3d 330, 333 (Tenn. 2002). Further, the trial court's applications of law to the facts are questions of law that we review de novo. *State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000). On appeal, the prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn therefrom. *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). The defendant bears the burden of establishing that the evidence contained in the record preponderates against the trial court's findings of fact. *Braziel v. State*, 529 S.W.2d 501, 506 (Tenn. Crim. App. 1975).

At a hearing on a motion to suppress evidence recovered as a result of a warrantless search, the State must prove that the search was reasonable. *State v. Coulter*, 67 S.W.3d 3,

41-42 (Tenn. Crim. App. 2001). To carry its burden, the State must prove that law enforcement conducted the warrantless search or seizure pursuant to one of the narrowly-defined exceptions to the warrant requirement. *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000) (citing *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997)). Our supreme court has held:

> [U]nder both the federal constitution and our state constitution, a search without a warrant is presumptively unreasonable, and any evidence obtained pursuant to such a search is subject to suppression unless the [S]tate demonstrates that the search was conducted under one of the narrowly defined exceptions to the warrant requirement. Moreover, Tennessee has approved of and adopted exceptions to the requirement of obtaining a valid search warrant, including search incident to arrest, plain view, stop and frisk, hot pursuit, search under exigent circumstances, and others.

*State v. Cox,* 171 S.W.3d 174, 179 (Tenn. 2005) (internal citations omitted).

Exigent circumstances exist: "'(1) when officers are in 'hot pursuit' of a fleeing suspect; (2) when the suspect presents an immediate threat to the arresting officers or the public; or (3) when immediate police action is necessary to prevent the destruction of vital evidence or thwart the escape of known criminals.'" *State v. Adams*, 238 S.W.3d 313, 321 (Tenn. Crim. App. 2005) (quoting *State v. Steven Lloyd Givens*, No. M2001-00021-CCA-R3-CD, 2001 WL 1517033, at \*3 (Tenn. Crim. App. Nov. 29, 2001)). In *State v. Meeks*, 262 S.W.3d 710, 723 (Tenn. 2008), our supreme court added an additional situation, "to render emergency aid to an injured person or to protect a person from imminent injury," to the list of circumstances that would establish exigent circumstances. The mere existence of one of these circumstances does not, in and of itself, validate a warrantless search; the State must also show that "'the exigencies of the situation made the search imperative.'" *Yeargan*, 958 S.W.2d at 635 (quoting *State v. Bartram*, 925 S.W.2d 227, 230 (Tenn. 1996)). The question of whether the exigent circumstances were sufficient to justify a warrantless search is a mixed question of law and fact that we review de novo. *Meeks*, 262 S.W.3d at 722.

The following guidance from our supreme court is instructive on this issue:

> [I]n assessing the constitutionality of a warrantless search, the inquiry is whether the circumstances give rise to an objectively reasonable belief that there was a compelling need to act and insufficient time to obtain a warrant. The exigency of the circumstances is evaluated based upon the totality of the circumstances known to the governmental actor at the time of the entry. Mere speculation is inadequate; rather, the State must rely upon specific and

articulable facts and the reasonable inferences drawn from them. The circumstances are viewed from an objective perspective; the governmental actor's subjective intent is irrelevant. The manner and the scope of the search must be reasonably attuned to the exigent circumstances that justified the warrantless search, or the search will exceed the bounds authorized by exigency alone.

*Id.* at 723-24.

At the suppression hearing in this case, Officer Shaffer testified that he was responding to an emergency call that was originally reported as a shooting. When he arrived at appellant's house , he was confronted by three frantic men, the Mitchells, who would only say, "'He's inside.'" Officer Shaffer then entered the house and found appellant in the living room, bleeding. By that time, other officers were already arriving. The Mitchells directed Officer Shaffer to the upstairs room, where he discovered the victim's body. Officer Shaffer returned to the lower floor, and soon thereafter, the crime scene technicians began processing the scene. According to the testimony at the suppression hearing, the emergency call was received at 1:21 a.m., Officer Shaffer arrived at 1:23 a.m., and the first crime scene technician arrived at 1:39 a.m. The victim's body was removed from the scene at either 5:00 or 5:30 a.m.

From this evidence, we conclude that Officer Shaffer's entry and search of appellant's house was justified by exigent circumstances. He was responding to an emergency call, and as the Mitchells were clearly not injured and were directing him inside, he had to enter the house "to render emergency aid to an injured person or to protect a person from imminent injury." *Meeks*, 262 S.W.3d at 723. Officer Shaffer immediately encountered an injured person, appellant, but the Mitchells insisted that "he" was upstairs. Based on this information and the condition of appellant, who did not have injuries consistent with what was reported in the emergency call, Officer Shaffer was justified in entering the upstairs bedroom, where he discovered the victim.

The question remains whether the subsequent officers were likewise justified in entering the house and whether the evidence seized was justifiable. Appellant argues that no exception to the warrant requirement applied to the officers, particularly the crime scene technicians, arriving after Officer Shaffer. He further argues that the processing of the crime scene, including taking video and photographs, and the seizure of evidence were outside the scope of the exigent circumstances search. He contends that even if this court were to apply the plain view doctrine to the seizure of the evidence, some of the evidence was not in plain view and should have been suppressed. In particular, appellant protests the seizure of the knife handle, the blue sweatshirt, and the gold nugget ring.

Appellant's argument relies in part on the United States Supreme Court's rulings that a homicide does not justify a warrantless search of a residence. The United States Supreme Court in *Mincey v. Arizona* declined to recognize a "murder scene exception" to the warrant requirement. 437 U.S. 385, 395 (1978); *see also Flippo v. West Virginia*, 528 U.S. 11, 14 (1999); *Thompson v. Louisiana*, 469 U.S. 17, 21 (1984) (per curiam). However, the Court also acknowledged the continuing viability of the exigent circumstances exception to the warrant requirement and the application of the plain view doctrine to the seizure of evidence discovered in the course of law enforcement officers' "legitimate emergency activities." *See Mincey*, 437 U.S. at 392-93 (citing *Michigan v. Tyler*, 436 U.S. 499, 509-10 (1978)). Nonetheless, the Court stated that "a warrantless search must be 'strictly circumscribed by the exigencies which justify its initiation.'" *Id.* at 393 (quoting *Terry v. Ohio*, 392 U.S. 1, 26 (1968)).

This court has previously encountered very similar circumstances and arguments as those presented herein. For example, in *Coulter*, the defendant told the police that he had killed his wife. *State v. Coulter*, 67 S.W.3d 3, 16 (Tenn. Crim. App. 2001). One officer handcuffed the defendant, drove him to the defendant's house, entered the house, and discovered the victim's body lying on a bed. *Id.* Another officer was dispatched to the defendant's house and collected evidence, including the murder weapon found on the kitchen table and the bed linen. *Id.* at 16-17. After paramedics removed the victim's body, the police discovered a spent bullet in the bed's box springs. *Id.* at 17. In addition, a later-arriving officer photographed the crime scene. *Id.* On appeal, the defendant contested the officers' warrantless search of his house and the seizure of evidence not in plain view, particularly the spent bullet. *Id.* at 40. This court ruled that the initial entry was justified under the exigent circumstances exception to the warrant requirement, that the collection of the murder weapon and bed linen were justified under the plain view doctrine, and that these doctrines allowed the responding officers to photograph the scene. *Id.* at 43 (citing *Bills v. Aseltine*, 958 F.2d 697, 707 (6th Cir.1992)). Furthermore, this court concluded, after surveying decisions from other states, that the entry of the later-arriving officers presented no Fourth Amendment issue under the circumstances of the case. *Id.* at 43-45. In particular, this court cited the following rationale:

> "[W]hen a law enforcement officer enters private premises in response to a call for help, and during the course of responding to the emergency observes but does not take into custody evidence in plain view, a subsequent entry shortly thereafter, by detectives whose duty it is to process evidence, constitutes a mere continuation of the original entry. Under such circumstances, it is permissible for the detectives to [seize,] photograph and take measurements [of], without a search warrant, . . . evidence which was in the plain view of the initial responding officers."

-19-

*Id.* at 44 (quoting *State v. Magnano*, 528 A.2d 760, 764 (1987)) (second and third alterations in *Coulter*).  The court also cited the following from the North Carolina Supreme Court:

> "[W]hen a law enforcement officer enters private premises in response to a call for help and thereby comes upon what reasonably appears to be the scene of a crime, and secures the crime scene from persons other than law enforcement officers by appropriate means, all property within the crime scene in plain view which the officer has probable cause to associate with criminal activity is thereby lawfully seized within the meaning of the fourth amendment. Officers arriving at the crime scene thereafter and while it is still secured can examine and remove property in plain view without a search warrant."

*Id.* at 44-45 (quoting *State v. Jolley*, 321 S.E.2d 883, 886 (1984)).  Finally, this court determined that the officers were justified in retrieving the bullet from the box springs because the bullet hole was in plain view once the victim's body was removed and the defendant could have no legitimate expectation of privacy in the bullet.  *Id.* at 45 (citations omitted).

Under the circumstances of this case, we conclude that the entry of officers arriving subsequent to Officer Shaffer was a continuation of his original entry.  *See Coulter*, 67 S.W.3d at 45.  We note that all of the officers, detectives, and crime scene technicians were essentially responding at the same time.  Officer Shaffer only arrived as quickly as he did because he was already in the area.

Furthermore, under *Mincey*, *Hicks*, and *Coulter*, evidence meeting the criteria under the plain view doctrine was subject to seizure.  For the plain view doctrine to apply, the following requirements must be met: "(1) the officer did not violate constitutional mandates in arriving at the location from which the evidence could plainly be seen; (2) the officer had a lawful right of access to the evidence; and (3) the incriminating character of the evidence was 'immediately apparent . . . .'" *Coulter*, 67 S.W.3d at 43 (citations omitted).  We have already determined that the KPD did not violate constitutional mandates by entering appellant's house.  The majority of the evidence seized was clearly in plain view, in particular the crowbar and the crack cocaine, and the incriminating nature of the evidence was immediately apparent.  Indeed, the only seized items that appellant claims could not be plainly seen were the gold ring from the bathroom and items found under a chair in the upstairs bedroom — the knife handle and a sweatshirt.  Based on the testimony and photographs, we agree that these three items either could not have been plainly seen or were outside the scope of the initial, exigent circumstances search.  The bathroom where the ring was found was not within the scope of Officer Shaffer's initial search, and there was no evidence presented that an officer entered that room looking for another victim or suspect.

-20-

*See Hicks*, 480 U.S. at 324-25 ("[T]aking action, unrelated to the objectives of the authorized intrusion, which exposed to view concealed portions of the apartment or its contents, did produce a new invasion of respondent's privacy unjustified by the exigent circumstance that validated the entry.") As for the sweatshirt, the testimony and photographs are unclear with regard to whether any officers could plainly see it. Ms. Gangwer testified that the sweatshirt was on top of an overturned chair but was possibly underneath other items. Regarding the knife handle, Ms. Gangwer testified that the officers did not know it was there until they began processing the scene. Therefore, we conclude that these items were not in plain view and thus were seized in violation of appellant's constitutional rights.

However, the State contends that the evidence not in plain view would have been inevitably discovered. "Under the inevitable discovery doctrine, illegally obtained evidence is admissible if the evidence would have otherwise been discovered by lawful means. Proof of inevitable discovery 'involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment.'" *State v. Cothran*, 115 S.W.3d 513, 525 (Tenn. Crim. App. 2003) (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)) (internal citations omitted).

This court's application of the inevitable discovery doctrine in *Brock* is instructive for this case. *See State v. Brock*, 327 S.W.3d 645, 686 (Tenn. Crim. App. 2009). In *Brock*, the defendant's truck was illegally seized and searched prior to defendant's confession. *Id.* However, this court held that after defendant's confession, the police would have had probable cause to seize and search the truck; therefore, the inevitable discovery doctrine operated to admit the illegally seized evidence from the truck. *Id.* This court also reasoned that "[t]his same analysis might also be said to apply to the search of [the defendant's] residence. It is indeed inevitable that a known homicide scene with a body present would eventually have been searched by lawful means." *Id.* at 686 n.2.

In this case, the police likewise had "a known homicide scene with a body present." It is clear that the police had sufficient probable cause to support a search warrant, had they sought to obtain one. *See State v. Joshua Eugene Anderson*, No. E2005-02660-CCA-R3-CD, 2007 WL 1958641, at *5 (Tenn. Crim. App. July 6, 2007); *State v. Rickie J. Stallings*, No. E2005-00239-CCA-R3-CD, 2006 WL 2061736, at *19 (Tenn. Crim. App. July 26, 2006). Therefore, we conclude that the inevitable discovery doctrine applies to the admission of the knife handle, sweatshirt, and ring. *See Brock*, 327 S.W.3d at 686; *Joshua Eugene Anderson*, 2007 WL 1958641, at *5; *Rickie J. Stallings*, 2006 WL 2061736, at *19. Consequently, any error in the trial court's suppression ruling is harmless beyond a reasonable doubt. *See Rickie J. Stallings*, 2006 WL 2061736, at *19.

## B. Admission of Crime Scene Photographs and Video

Appellant contends that the trial court erred by admitting photographs of the crime scene and video of the crime scene. In particular, he argues that both the photographs and video should have been excluded as fruits of an illegal search and that both were prejudicial and inflammatory. Regarding the video only, he argues that it was duplicative. The State responds that appellant has waived this issue.

Tennessee Rules of Evidence 401, 402, and 403 govern the admissibility of the photographs in this case. *See State v. Banks*, 564 S.W.2d 947, 949-51 (Tenn. 1978). First, a witness with knowledge of the facts must verify and authenticate a photograph before it can be admitted into evidence. *Id.* at 949; *see also* Tenn. R. Evid. 901. Next, a trial court must first determine whether the photograph is relevant. *Id.*; *see* Tenn. R. Evid. 401. Irrelevant evidence is inadmissible. Tenn. R. Evid. 402. If the evidence has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," it is relevant. Tenn. R. Evid. 401. Once it determines that a photograph is relevant, the trial court must then determine whether the probative value of the photograph is substantially outweighed by the danger of unfair prejudice. *See* Tenn. R. Evid. 403; *Banks*, 564 S.W.2d at 950-51. "Unfair prejudice" is "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Banks*, 564 S.W.2d at 951 (quoting Fed. R. Evid. 403 advisory committee's note). Furthermore,

> A trial court should consider: the accuracy and clarity of the picture and its value as evidence; whether the picture depicts the body as it was found; the adequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to establish a *prima facie* case of guilt or to rebut the defendant's contentions.

*State v. Leach*, 148 S.W.3d 42, app. at 63 (Tenn. 2004) (citing *Banks*, 564 S.W.2d at 951).

The decision whether to admit the photographs rests within the trial court's sound discretion, and we will not reverse the trial court's determination absent a clear showing of an abuse of that discretion. *Banks*, 564 S.W.2d at 949; *see also State v. Dubose*, 953 S.W.2d 649, 653 (Tenn. 1997); *State v. Stinnett*, 958 S.W.2d 329, 331 (Tenn. 1997). Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases. *See Banks*, 564 S.W.2d at 949.

Regarding appellant's first argument that the photographs and video were products of an illegal search, we have already determined that the police were allowed to enter the

home due to exigent circumstances and seize evidence in plain view. *See supra* Part II A. As a corollary to this ruling and based upon the rationale in *Coulter*, we conclude that the police were allowed to photograph and videotape the crime scene as it appeared when they arrived. *See Coulter*, 67 S.W.3d at 43. However, many of the photographs depict police investigative procedures, such as evidence markers, or objects after the police had moved them. Again, we have determined that any evidence not in plain view would have been inevitably seized pursuant to a warrant in a case such as this; by the same reasoning, we conclude that the photographs depicting the police investigation would have been inevitably taken. *See Brock,* 327 S.W.3d at 686 & n.2.

Appellant also argues that the crime scene photographs were inflammatory due to the presence of police, depiction of evidence markers, graphic nature of the victim's head trauma, and alteration of the original crime scene. However, the State argues that appellant has waived this argument due to failure to object at the proper time. The State's argument is well-taken with regard to all photographs with one exception.

The record shows that appellant specifically objected to exhibits 116, 125-127, and 132-134. Exhibit 116 depicted crime scene technician Gerald Smith holding a measuring tool next to the victim's head trauma. At trial, appellant objected that the photograph was "posed" and that other photographs could show the victim's injury without the measuring tool. The trial court ruled that the photograph's probative value was not substantially outweighed by the danger of unfair prejudice.[2] Based on the record before us, we conclude that the trial court did not abuse its discretion in admitting the photograph. *Banks*, 564 S.W.2d at 949. Issues at trial included whether a man or woman could have exerted the force required to injure the victim and the credibility of the police investigation; thus, there was a "need for the evidence to establish a *prima facie* case of guilt or to rebut the defendant's contentions." *Id.* at 951. The photograph shows the extent of the victim's injury, and by comparing it with autopsy photographs, the State was able to show that the condition of the body did not change. Appellant has not established that the probative value of exhibit 116 was substantially outweighed by the danger of unfair prejudice.

With regard to 125-127 and 132-134, the trial court reserved its ruling until a witness could lay a proper foundation with regard to what each photograph depicted. When the State moved to admit the photographs during Gerald Smith's testimony, appellant did not object. Appellant's failure to object prevented the trial court from making a ruling on the admissibility of the evidence. Therefore, appellant has waived his argument regarding

---

[2] The trial court actually misspoke during its ruling when defense counsel interrupted by saying that the probative value was not substantially outweighed by its probative value. The trial court's intention in its ruling, however, was clear.

exhibits 125-127, 132-134, and any other exhibit to which he did not specifically object. *See* Tenn. R. App. P. 36(a). ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.")

Appellant also argues that the crime scene videotape was admitted in error. He complains that it was taken without a warrant and that it was inflammatory and duplicative. Again, our ruling regarding the warrantless search includes the videotaping of the crime scene; therefore, appellant's contention is without merit. As for the inflammatory and duplicative nature of the videotape, the appellant only objected "[b]ased on previous rulings." The State argues that this was a "blanket objection" and that this court should regard it as waiver of the issue. This court recently made the following ruling with regard to a similar objection:

> [W]e conclude that such a blanket objection is essentially no different than no objection being made. Perhaps the basis of the objection was clear to the trial court for reasons that are not apparent from the print of the transcript. But a reviewing court has no way to guess as to what was the basis of the objection.

*State v. Neil Vader*, No. M2011-02394-CCA-R3-CD, 2013 WL 1279196, at *5 (Tenn. Crim. App. Mar. 28, 2013), *no perm. app. filed*. After carefully reviewing the record, we cannot discern exactly on which previous rulings appellant was relying when he objected to the introduction of the crime scene video. In addition, there does not appear to be an objection on the basis of the video being duplicative, which is the primary focus of appellant's argument on appeal. Therefore, we conclude that appellant has waived our review of this issue.

### C. Warrantless Withdrawal of Appellant's Blood

Appellant contends that his blood was drawn without his consent and without a search warrant. He argues that any evidence of the illegally obtained blood samples should have been suppressed. The State concedes that appellant's blood was drawn illegally but contends that the error was harmless beyond a reasonable doubt. We agree with the State.

At the motion to suppress hearing in this case, Officer Shaffer testified that he requested that the hospital staff draw appellant's blood. His reasoning was that the police needed the blood to compare with the blood found at the scene. The State argued that the metabolization of the cocaine in appellant's system was an exigent circumstance that justified the warrantless drawing of appellant's blood. The trial court, however, ruled that the blood

evidence was admissible because Officer Shaffer had probable cause to believe that appellant had committed a crime.

Because this issue centers on a legal conclusion rather than factual findings, we review the trial court's decision de novo. *Randolph*, 74 S.W.3d at 333. It has long been clear that the withdrawal of a person's blood is a search subject to the constraints of the Fourth Amendment. *See Missouri v. McNeely*, 569 U.S. ---, 133 S.Ct. 1552, 1558 (2013); *Schmerber v. California*, 384 U.S. 757, 767-72 (1966); *State v. Blackwood*, 713 S.W.2d 677, 679 (Tenn. Crim. App. 1986). In this case, there was no warrant obtained prior to the withdrawal of appellant's blood in the early morning hours of February 20, 2002. Moreover, there has been no evidence presented that exigent circumstances or any other exception to the Fourth Amendment's warrant requirement applied to justify this warrantless search.[3] While it might be true that Officer Shaffer had probable cause to believe appellant had committed murder, having probable cause is not an exception to the warrant requirement but rather a prerequisite. Thus, it was error for the trial court to admit evidence of the blood samples taken without a warrant.

Earlier in this opinion, we applied the inevitable discovery doctrine in this case to admit illegally obtained evidence; however, that doctrine cannot be applied in this situation. The only evidence at trial that stemmed from the inadmissible blood samples was the testimony that appellant had cocaine in his system. TBI forensic scientist Melanie Carlisle testified about how quickly cocaine metabolizes. Based on her testimony, we cannot apply the inevitable discovery doctrine to cure the inadmissibility of the blood evidence because it is unknown whether Ms. Carlisle would have found the cocaine in appellant's blood had she tested blood acquired pursuant to a warrant, which would have taken time to obtain, rather than test the illegally acquired blood. Therefore, appellant's blood evidence and the testimony regarding the blood tests should have been excluded.

However, the State contends that the error was harmless beyond a reasonable doubt, and we agree. "If a constitutional error is not structural, then it is subject to harmless error analysis, and the proper test is whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *State v. Allen*, 69 S.W.3d 181, 190

---

[3] At trial, the prosecution argued – without support from Officer Shaffer's testimony – that the metabolization of cocaine in appellant's bloodstream was an exigent circumstance justifying the search. However, this was not the rationale employed by the trial court in its ruling. In addition, the United States Supreme Court in *McNeely* declined to create a *per se* rule that the metabolization of alcohol in the bloodstream is an exigent circumstance justifying a warrantless search and confirmed that the existence of an exigent circumstance must be decided on a case-by-case basis. 569 U.S. ---, 133 S.Ct. at 1560. Again, Officer Shaffer's testimony presented no evidence of an exigent circumstance or any knowledge that drugs were involved in this case.

(Tenn. 2002) (internal quotation marks omitted) (citing *Neder v. United States*, 527 U.S. 1, 15 (1999)). The State argues that the blood test results were not key to the State's case. At best, the blood test results corroborated Penny Cox's testimony that she and appellant smoked crack cocaine after he killed the victim. However, Ms. Cox's testimony was thoroughly impeached by the defense, and it appears that the jury did not find her credible considering they found appellant guilty of facilitation of first degree murder and facilitation of especially aggravated robbery rather than the charged offenses of premeditated murder, felony murder, and aggravated robbery. Furthermore, we note that both Ms. Cox and John Mitchell testified about appellant's habitual use of cocaine. The State did not need the blood test results to advance its theory that appellant robbed the victim when Mr. Mitchell testified that the victim had more cocaine on his person prior to his death than after, had a large amount of cash that was missing, and was missing a gold ring. Therefore, we conclude beyond a reasonable doubt that the error in the admission of the blood evidence did not contribute to the verdict obtained and was thus harmless beyond a reasonable doubt. Appellant is without relief as to this issue.

## D. Prior Bad Act Evidence

Appellant argues in the alternative that the admission of the blood test results showing that appellant's blood was positive for cocaine was error under Tennessee Rule of Evidence 404(b).[4] The State failed to address the issue in their brief. However, at trial, the State advanced the argument that the blood test results corroborated various witnesses' testimonies and supported their theory of appellant's motive. The trial court allowed TBI forensic scientist Melanie Carlisle to testify about the results, provided that the State presented evidence linking appellant's cocaine use to his motive in committing the offenses.

Rule 404(b) provides:

Other Crimes, Wrongs, or Acts.—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1)     The court upon request must hold a hearing outside the jury's presence;

---

[4] The heading in appellant's brief also posits that the trial court erred by admitting evidence of appellant's drug use through Penny Cox's testimony; however, he did not support this contention with citations to the record or argument in the body of his brief. Therefore, we deem that he has waived plenary review of this issue on appeal. *See* Tenn. Ct. Crim. App. R. 10(b).

(2)    The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and

(3)    The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). Possible "other purposes" for which evidence of other crimes, wrongs or acts may be admitted include identity (including motive and common scheme or plan), intent, or rebuttal of accident or mistake. Tenn. R. Evid. 404(b), Advisory Comm'n Commt.

Thus, to satisfy the requirement of relevancy, the first inquiry by the trial court must be whether "'a material issue exists other than conduct conforming with a character trait.'" *State v. McCary*, 922 S.W.2d 511, 514 (Tenn. 1996) (quoting Tenn. R. Evid. 404(b)). Upon the court's satisfaction of the existence of a material issue, the trial court must then weigh the proffered evidence to determine whether the probative value outweighs the danger of unfair prejudice to the defendant. *McCary*, 922 S.W.2d at 514 (citing Tenn. R. Evid. 404(b)). The trial court must finally find that appellant committed the other crimes, wrongs, or acts by clear and convincing evidence. *Id.* (citations omitted).

When it substantially complies with the procedural requirements of Rule 404(b), the trial court's determination of admissibility is entitled to deference on appeal. *State v. Gilley*, 297 S.W.3d 739, 758 (Tenn. 2008); *see State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997). In reviewing a trial court's ruling on 404(b) evidence, an appellate court may not disturb the lower court's ruling absent an abuse of discretion. *Gilley*, 297 S.W.3d at 758; *State v. Thacker*, 164 S.W.3d 208, 240 (Tenn. 2005).

The trial court in this case did not substantially comply with the procedural requirements because it did not state on the record what material issue existed nor did it make a finding that the probative value was not outweighed by the danger of unfair prejudice. Nonetheless, we conclude that it was not error under Rule 404(b) because the State presented a material issue — motive — that it later supported with additional testimony. The trial court tacitly accepted the State's argument and allowed the evidence to be admitted. Likewise, we accept the State's argument that the evidence was relevant to prove motive, although, as previously stated, it was not essential to proving motive. There was plentiful other evidence admitted regarding appellant's drug use; thus, the danger of unfair prejudice was minimal in comparison to the probative value. Therefore, the admission of the evidence was not error under Rule 404(b).

E. Destruction of Evidence

On appeal, appellant presents three issues stemming from the destruction of the following evidence: the physical evidence, the 9-1-1 recording, and John Mitchell's statement to police.

1. Physical Evidence

Prior to trial, all of the physical evidence in appellant's case, including the murder weapons, clothing worn by appellant and the victim, and the gold ring, disappeared. The record indicates that the evidence was stored in an off-site facility to which only a few officers had access. The evidence was placed near the door of the facility for viewing by the attorneys, but the attorneys did not come at the scheduled time due to a continuance. Soon thereafter, the evidence disappeared. The State speculated that it had been accidently destroyed along with other evidence that had been marked for destruction pursuant to court order. The trial court ruled that the destruction was caused by simple negligence, that the evidence had some exculpatory value, and that the secondary evidence was reliable and would allow appellant to present a defense. Appellant now claims that this ruling was error.

In *Ferguson*, our supreme court considered the appropriate "consequences that flow from the State's loss or destruction of evidence which the accused contends would be exculpatory." *State v. Ferguson*, 2 S.W.3d 912, 914 (Tenn. 1999). Our supreme court exercised its authority "to expand the minimum level of protection mandated by the federal constitution," *Burford v. State*, 845 S.W.2d 204, 207 (Tenn. 1992), by rejecting the United States Supreme Court's "bad faith" standard in favor of a test that is less onerous on a criminal defendant. *Ferguson*, 2 S.W.3d at 916; *see generally Arizona v. Youngblood*, 488 U.S. 51 (1988). The court, instead, "'promulgate[d] . . . an analysis in which the critical inquiry is: Whether a trial, conducted without the [lost or] destroyed evidence, would be fundamentally fair?'" *Coulter*, 67 S.W.3d at 54 (quoting *Ferguson*, 2 S.W.3d at 914). The *Ferguson* analysis requires a court to first determine "whether the State had a duty to preserve the evidence." *State v. Merriman*, 410 S.W.3d 779, 785 (Tenn. 2013). The State has a general duty to preserve evidence subject to discovery and inspection in accordance with Tennessee Rule of Criminal Procedure 16 and *Brady v. Maryland*, 373 U.S. 83 (1963). *Id*. However, "the State's duty to preserve evidence is limited to constitutionally material evidence described as 'evidence that might be expected to play a significant role in the suspect's defense.'" *Id.* (quoting *Ferguson*, 2 S.W.3d at 917). Our supreme court held that to meet this materiality standard, "the evidence must potentially possess exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* (citing *Ferguson*, 2 S.W.3d at 915, 918).

If the proof demonstrates that the State had a duty to preserve the evidence and that the State failed in that duty, the analysis then shifts to a consideration of the following factors in deciding the consequences of the State's breach:

(1)     [t]he degree of negligence involved;

(2)     [t]he significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and

(3)     [t]he sufficiency of the other evidence used at trial to support the conviction.

*Id.* (quoting *Ferguson*, 2 S.W.3d at 917) (alteration in original).

If, after due consideration of the three factors, the trial court concludes that a trial without the missing or destroyed evidence would not be fundamentally fair, the court may order dismissal of the charges. *Ferguson*, 2 S.W.2d at 917. "Dismissal is, however, but one of the trial judge's options." *Id.* The trial court may craft a special jury instruction or grant other appropriate remedies. *Id.* This court reviews the trial court's decision de novo, with deference to the trial court's findings of fact unless the evidence preponderates against the findings. *See Merriman*, 410 S.W.3d at 791. Any remedy crafted by the trial court is reviewed under an abuse of discretion standard. *Id.* at 791-92.

All of the physical evidence in this case was destroyed, from the murder weapons to appellant's fingernail clippings. Appellant contends that the evidence would have played a significant role in his defense because the exculpatory nature of the evidence was apparent and because there was no comparable evidence. Clearly, there was no comparable evidence to be had that could replace any of the evidence destroyed. However, the exculpatory nature of the evidence was only speculative. All of the items had already been tested by the State, but it appears that the defense had never even inspected the evidence — despite having many years in which to do so. Perhaps appellant might have recovered fingerprints where the State's experts were unable to do so, or maybe he would have been able to cross-examine the State's witnesses more exactly about their testing methods and the chain of custody. Nonetheless, due to the bizarre circumstance that *all* of the physical evidence was destroyed, appellant's argument that the evidence would have played a significant role in his defense is well-taken because while the evidence "was probably of marginal exculpatory value, it was at least material to the preparation of the defendant's defense." *See Ferguson*, 2 S.W.3d at 918 (internal quotation marks omitted). Therefore, the State had a duty to preserve the evidence and breached that duty.

-29-

The trial court found that the destruction of the evidence was accidental, and as no evidence was presented that preponderates against that finding, we defer to the trial court's finding. Thus, because the evidence was destroyed accidentally, we agree with the trial court that the destruction was due to simple negligence.

The next factor to consider is the significance of the evidence in light of the probative value and the available secondary or substitute evidence. In this case, our review of the record indicates that the probative value of the evidence weighs more in favor of the State, considering the impact on the jury of having the actual murder weapons and bloody clothing presented rather than photographs. Photographs of the majority of the destroyed evidence were available and were used at trial. Appellant appears to have been able to mount his defense effectively despite having to use photographs rather than physical evidence, considering he was convicted of lesser included offenses.

We must also consider the sufficiency of the other evidence presented at trial. The most incriminating evidence was the testimony of Penny Cox. John Mitchell's testimony was also significant considering his statement that appellant allegedly confessed to him that he did not "do it" — the killing of the victim — alone, and his observation that the victim had more cocaine and cash on him prior to his death than at his autopsy. The State also presented laboratory reports showing appellant had the victim's blood on his clothing and hands. Thus, there was sufficient other evidence to convict appellant of the offenses.

Taking all of these factors into consideration, it is clear that appellant "was not hindered in the full and complete exposition of his theory to the jury." *See Ferguson*, 2 S.W.3d at 918. We conclude that appellant's trial was fundamentally fair, and his argument to the contrary is without merit.

## 2. 9-1-1 Log

On appeal, appellant presents two arguments regarding whether the trial court erred by admitting the log of the 9-1-1 call when the original recording of the call had been destroyed pursuant to the procedure of the Knox County Emergency Communications District. First, he contends that under *Ferguson*, the destruction of the recording rendered it plain error for the trial court to admit the 9-1-1 log. Secondly, appellant argues that the log contained hearsay statements that did not meet the business records or public records hearsay exceptions. *See* Tenn. R. Evid. 803(6), 803(8). The State responds that appellant waived the *Ferguson* argument by not addressing it below and that the entire 9-1-1 log qualified as a business record, rendering it admissible *in toto* under the business records hearsay exception. We agree that appellant waived the *Ferguson* argument; however, the admission of hearsay statements within the 9-1-1 log was harmless error.

-30-

Appellant argues for the first time on appeal that the *Ferguson* analysis should apply to the destruction of the 9-1-1 recording, with the remedy being the exclusion of the 9-1-1 log. However, appellant did not raise this issue below prior to trial, during trial, or in his motion for new trial.[5] He contends that this court should review the matter for plain error.

Our supreme court formally adopted this court's *Adkisson* test for reviewing claims of plain error:

> The Court of Criminal Appeals has developed five factors to consider when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). To rise to the level of "plain error," an error "'must [have been] of such a great magnitude that it probably changed the outcome of the trial.'" *Adkisson*, 899 S.W.2d at 642 (quoting *United State v. Kerley*, 838 F.2d 932, 937 (7th Cir. 1988)). All five factors must be established by the record before a court will find plain error. *Smith*, 24 S.W.3d at 282. Complete consideration of all the factors is not necessary when clearly at least one of the factors cannot be established by the record.

Here, appellant has not established that consideration of the error is necessary to do substantial justice. He claims that certain evidence — his statement to Mr. Mitchell that he did not commit the murder by himself — would have been heard on the 9-1-1 recording but was not included in the 9-1-1 log; consequently, he claims that under *Ferguson*, the 9-1-1 log should have been excluded as a remedy for the State's failure to preserve the 9-1-1 recording. However, evidence of appellant's statement was presented to the jury through Mr. Mitchell's testimony, and there is no indication other than Mr. Mitchell's speculation that appellant's statement was in fact recorded on the 9-1-1 call. Therefore, we decline to apply plain error review and conclude that appellant has waived plenary review on appeal. *See* Tenn. R. App. P. 36(a)-(b).

---

[5] In his reply brief, appellant claims that he should be allowed to present his *Ferguson* argument for the first time on appeal. However, in *Merriman*, the supreme court repeatedly referred to the trial court performing the *Ferguson* analysis. *See Merriman*, 410 S.W.3d at 786-90. Contrary to appellant's assertion, the supreme court's ruling that this court should review a trial court's *Ferguson* analysis de novo does not relieve appellant of the responsibility of raising the issue at the trial level. *See id.* at 790-92.

However, appellant's argument regarding hearsay has some merit. Appellant contends that the trial court erred by admitting the entirety of the 9-1-1 log without determining whether each statement therein met a hearsay exception. At trial, he particularly disputed the log's documentation of the search for Penny Cox by stating what the various police officers were doing to locate her.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Generally, hearsay is not admissible at trial unless it falls within an exception to the exclusionary rule. Tenn. R. Evid. 802. We are aware of the disagreement among panels of this court regarding the appropriate standard of review of the admissibility of hearsay evidence;[6] however, for purposes of this case, the result is the same whether reviewed for abuse of discretion or de novo.

In the trial court, the State moved for admission of the 9-1-1 log in its entirety under both the business records exception, Tenn. R. Evid. 803(6), and the public records exception, Tenn. R. Evid. 803(8). Tennessee Rule of Evidence 803(6) provides:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness or by certification that complies with Rule 902(11) or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph

---

[6] *See State v. Dotson*, 254 S.W.3d 378, 392 (Tenn. 2008) (in considering an issue involving hearsay, holding that "questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this Court will not interfere in the absence of abuse appearing on the face of the record"); *Pylant v. State*, 263 S.W.3d 864, 871 n.26 (Tenn. 2008) (maintaining that the standard of review for hearsay issues is abuse of discretion); *Willie Perry, Jr. v. State*, No. W2011-01818-CCA-R3-PC, 2012 WL 2849510, at *3 (Tenn. Crim. App. July 11, 2012), *perm. app. denied* (Tenn. 2012), (stating that standard of review for admissibility of evidence is abuse of discretion). *But see State v. Gilley*, 297 S.W.3d 739, 760 (Tenn. Crim. App. 2008) (stating that whether a statement is offered to prove the truth of the matter asserted is "necessarily a question of law" and is not subject to review under abuse of discretion standard); *State v. Schiefelbein*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007) (holding that appellate review of hearsay issues is de novo with no presumption of correctness); *Willie Perry, Jr.,* 2012 WL 2849510, at *7 (Bivins, J., concurring) (applying de novo standard of review to hearsay issues).

includes business, institution, profession, occupation, and calling of every kind, whether or not conducted for profit.

The public records exception, Rule 803(6), states:

Unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness, records, reports, statements, or data compilations in any form of public offices or agencies setting forth the activities of the office or agency or matters observed pursuant to a duty imposed by law as to which matters there was a duty to report, excluding, however, matters observed by police officers and other law enforcement personnel.

The admissibility of certain types of documents under Rule 803(6) "does not mean that every entry contained in the documents can be admitted into evidence." *State v. Rucker*, 847 S.W.2d 512, 516 (Tenn. Crim. App. 1992). In this case, the log contained "matters observed by police officers" — specifically, the report from a police officer that the officer had spoken with someone about Penny Cox's whereabouts and statements regarding the police department's contacting various taxicab companies. The public records exception, Rule 803(8), prohibits such observations. Therefore, it was error for the trial court to admit the entirety of the 9-1-1 log without excluding the specific prohibited statements. Nonetheless, the error is clearly harmless in light of the other evidence presented during the trial about Ms. Cox's whereabouts following the victim's death. *See* Tenn. R. Evid. 36(b).

### 3. John Mitchell's Testimony

Appellant argues that the trial court should not have allowed John Mitchell to testify because the recording and transcript of his interview with the police had been destroyed. The sole basis of his argument on appeal is that the trial court should have applied the *Ferguson* analysis. However, he did not object on this basis in the trial court, instead choosing to object on the basis of *Jencks v. United States*, 353 U.S. 657 (1957), and Tennessee Rule of Criminal Procedure 26.2. "An appellant cannot change theories from the trial court to the appellate court." *State v. Banes*, 874 S.W.2d 73, 82 (Tenn. Crim. App. 1993). In addition, he did not present this argument in his motion for new trial. Appellant's argument is thus waived. *See* Tenn. R. App. P. 3(e) (failure to state issue regarding admission of evidence in motion for new trial results in waiver)*; State v. Brewer*, 932 S.W.2d 1, 9 (Tenn. Crim. App. 1996) (citing *State v. Gregory*, 862 S.W.2d 574, 578 (Tenn. Crim. App. 1993)). Moreover, we decline to review this issue for plain error.

F. Admission of Autopsy Report and Dr. Mileusnic-Polchan's Testimony

Appellant contends that it violated his right to confront witnesses for the trial court to admit the autopsy report compiled by Dr. Sandra Elkins through the testimony of Dr. Mileusnic-Polchan. In so arguing, appellant relies on the United States Supreme Court opinions of *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 307 (2009), and *Bullcoming v. New Mexico*, --- U.S. ---, 131 S.Ct. 2705, 2709 (2011). In addition, appellant submits that Dr. Mileusnic-Polchan should not have been accepted as an expert because she was not licensed to practice medicine in Tennessee at the time of the victim's autopsy nor should she have been allowed to testify regarding her own conclusions drawn from Dr. Elkins' report. The State responds that there was no error, and we agree.

1. Autopsy Report

This court recently handled a very similar issue and determined that it was not error for the trial court to admit an autopsy report written by a different medical examiner than the one testifying. *See State v. Jessie Dotson*, No. W2011-00815-CCA-R3-DD, 2013 WL 4728679, at *66 (Tenn. Crim. App. June 25, 2013).[7] This court summarized the case law regarding the Confrontation Clause and forensic reports as follows:

In *Crawford v. Washington*, 541 U.S. 36, 68 (2004), the United States Supreme Court held that "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands . . . unavailability and a prior opportunity for cross-examination." "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law." *Id.* The Court adopted what came to be known as "the primary purpose test" for distinguishing testimonial statements from nontestimonial statements, concluding:

Statements are nontestimonial when made in the course of police investigation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

_____

[7] As a death penalty case, *Jessie Dotson* was automatically appealed to the Tennessee Supreme Court and is pending as of the filing of this opinion.

*Davis v. Washington*, 547 U.S. 813, 822 (2006).  Objective evaluation of "the circumstances in which the encounter occurs and the statements and actions of the parties" is necessary to determine whether a statement is testimonial or nontestimonial.  *Michigan v. Bryant*, --- U.S. ---, 131 S.Ct. 1143, 1156 (2011).

In *Melendez–Diaz v. Massachusetts*, 557 U.S. 305, 307 (2009), the Court concluded that "affidavits reporting the results of forensic analysis which showed that material seized by the police and connected to the defendant was cocaine" were testimonial and subject to exclusion as violating the confrontation clause.  The Court concluded that "the affidavits 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial' "and that "under Massachusetts law the sole purpose of the affidavits was to provide 'prima facie evidence of the composition, quality, and the net weight' of the analyzed substance." *Id.* at 311 (citations omitted).  The Court held that absent a showing that the analysts were unavailable to testify at trial and that the defendant had a prior opportunity to cross-examine them, the defendant was entitled to confront the analysts at trial.  *Id.*  The Court concluded that live confrontation of the witness by the defendant was the only constitutionally permissible way "to challenge or verify the results of a forensic test" and observed that confrontation would "weed out" fraudulent and incompetent forensic analysis.  *Id.* at 318-19.  The Court rejected the argument that reports of forensic testing were admissible as business records and that business records were exempted from the ruling in *Crawford*.  *Id*. at 321-24.

In *Bullcoming v. New Mexico*, --- U.S. ---, 131 S.Ct. 2705, 2709 (2011), the prosecutor introduced the results of forensic testing through the testimony of a forensic analyst who was familiar with the laboratory's testing procedures but did not participate or observe the test on the defendant's blood sample.  The Court held that the defendant's confrontation rights were violated, noting that "if an out-of-court statement is testimonial in nature, it may not be introduced against the accused at trial unless the witness who made the statement is unavailable and the accused has had a prior opportunity to confront the witness."  *Id.* at 2713.  The Court rejected the argument that substitute testimony satisfied the constitutional requirement based upon the reliable nature of the tests themselves, explaining that "the analysts who write reports that the prosecution introduces must be made available for confrontation even if they possess 'the scientific acumen of Mme. Curie and the veracity of Mother Teresa.'" *Id*. at 2715 (quoting *Melendez-Diaz*, 557 U.S. at 319 n. 6).  The Court concluded that the Confrontation Clause "does not

tolerate dispensing with confrontation simply because the court believes that questioning one witness about another's testimonial statements provides a fair enough opportunity for cross-examination." *Id.* at 2716.

*Jessie Dotson*, 2013 WL 4728679, at *64.

The *Jessie Dotson* opinion explained that while *Melendez-Diaz* and *Bullcoming* led this court to the opposite conclusion in *State v. James Drew Freeman, Jr.*, No. M2011-00184-CCA-R3-CD, 2012 WL 1656975, at *10-13 (Tenn. Crim. App. May 9, 2012), *perm. app. denied* (Tenn. Oct. 17, 2012), the United States Supreme Court's latest opinion on the matter, *Williams v. Illinois*, --- U.S. ---, 132 S.Ct. 2221 (2012), effectively abrogated *James Drew Freeman, Jr. See Jessie Dotson*, 2013 WL 4728679, at *65-66. The court summarized *Williams v. Illinois*:

> *Williams* involved a bench trial in a rape case during which a forensic specialist from the Illinois state laboratory testified that she matched a DNA profile produced by an outside laboratory from a vaginal swab taken from the victim to a profile that the state laboratory obtained using a sample of the defendant's blood. In a plurality opinion, the Court concluded that the testimony did not violate the Confrontation Clause. *Id.* at 2240. The Court noted that while the report from the independent laboratory was not introduced into evidence, the admission of the report would not have violated the Confrontation Clause even if the report had been introduced for its truth. *Id.* at 2242.
>
> The Court stated that the "Confrontation Clause refers to testimony by 'witnesses against' an accused." *Id.* The Court explained:
>
> > The abuses that the Court has identified as prompting the adoption of the Confrontation Clause shared the following two characteristics: (a) they involved out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct and (b) they involved formalized statements such as affidavits, depositions, prior testimony, or confessions.
>
> *Id.* The Court noted that while it held that the forensic reports at issue in *Melendez-Diaz* and *Bullcoming* qualified as testimonial statements, "the Court did not hold that all forensic reports fall into the same category." *Id.* at 2243. Rather, the introduction of the reports, which reported an elevated

blood-alcohol level and the presence of an illegal drug, violated the Confrontation Clause "because they were the equivalent of affidavits made for the purpose of proving the guilt of a particular criminal defendant at trial." *Id.* There was no ongoing emergency, as both suspects had already been captured, and the tests were "relatively simple" and generally could be performed by a single analyst. *Id.* The Court also noted that the technicians who prepared the reports must have realized that the contents of the reports would be incriminating. *Id.* The Court also noted earlier in its opinion that the forensic reports in *Melendez-Diaz* and *Bullcoming* included a testimonial certification, made in order to prove a fact in a criminal trial. *Id.*

The Court explained that an objective test is to be applied in determining the primary purpose of an out-of-court statement. *Id.* "We look for the primary purpose that a reasonable person would have ascribed to the statement, taking into account all of the surrounding circumstances." *Id.* The Court concluded that the primary purpose of the report from the independent laboratory in *Williams* was not to accuse the defendant or to create evidence for use at trial. *Id.* Rather, the primary purpose of the report was to "catch a dangerous rapist who was still at large." *Id.*

. . . . As Justice Breyer recognized in his concurring opinion in Williams, "[a]utopsies, like the DNA report in this case, are often conducted when it is not yet clear whether there is a particular suspect or whether the facts found in the autopsy will ultimately prove relevant in a criminal trial." 132 S.Ct. at 2251 (Breyer, J. concurring).

*Jessie Dotson*, 2013 WL 4728679, at *65-66.

Applying *Williams*, this court determined that admitting the autopsy report in *Jessie Dotson* when the medical examiner who compiled the report did not testify was not a violation of Dotson's right to confront witnesses. *Id.* at *66. In that case, the primary purpose of the autopsy report "was not to target the defendant as the perpetrator but instead to identify the injuries sustained by the victims and their causes of death." *Id.*

The primary distinguishing fact between *Jessie Dotson* and the case *sub judice* is that appellant was already in custody when the autopsy was performed, whereas Dotson was not. *See id.* Nonetheless, our review of the autopsy report in this case leads us to conclude that its primary purpose was to identify the injuries sustained by the victim and determine his cause of death. It was not "accusing a targeted individual of engaging in criminal conduct." *Williams*, 132 S.Ct. at 2242. Moreover, the autopsy report would have remained the same

whether or not the police had appellant or any other suspect in custody.  Therefore, under the primary purpose test, the autopsy report was not testimonial,[8] and its admission at trial absent the presence of its author, Dr. Elkins, was not a violation of the Confrontation Clause.

## 2.  Dr. Mileusnic-Polchan's Testimony

Appellant argues that Dr. Mileusnic-Polchan should not have been accepted as an expert because she was not licensed to practice medicine in Tennessee as of the date of the victim's autopsy.  In support of his argument, he points to Tennessee Code Annotated section 29-26-115(b), which requires that a licensed health care professional testifying in a medical malpractice lawsuit must be licensed to practice in Tennessee or a contiguous state in the year proceeding the alleged tort.  However, he has not provided any authority suggesting that this statute should apply to an expert testifying in a criminal matter, and we decline his invitation to so apply it.

Appellant further argues that Dr. Mileusnic-Polchan's testimony violated his right of confrontation because she did not perform the autopsy yet was testifying as to her conclusions drawn from the autopsy report.  This court in *Jessie Dotson* addressed this issue and determined that it was proper for a medical examiner to testify with regard to an autopsy performed by another medical examiner.  *Jessie Dotson*, 2013 WL 4728679, at *66.  As in *Jessie Dotson*, Dr. Mileusnic-Polchan was testifying within her area of expertise and relied on a document, the autopsy report, that was "'of a type reasonably relied upon by experts.'" *Id.* (quoting Tenn. R. Evid. 703).  It is clear that Dr. Mileusnic-Polchan testified as to her own conclusions, and appellant had an opportunity to thoroughly cross-examine her.  This court has previously noted that several federal courts have held that "'the Confrontation Clause does not limit experts offering their own opinion regardless of the independent admissibility of the material relied upon.'" *James Drew Freeman, Jr.*, 2012 WL 1656975, at *14 (quoting *Nardi v. Pepe*, 662 F.3d 107, 112 (1st Cir. 2011)) (citing *United States v. Pablo*, 625 F.3d 1285, 1292 (10th Cir. 2010)).  Having held that the autopsy report was not testimonial, we further conclude that Dr. Mileusnic-Polchan's testimony did not violate appellant's right to confrontation.

---

[8] In his concurring opinion in *Williams*, Justice Breyer questioned what the result would be if the Court were ever to hold that autopsy reports were testimonial, writing, "What is to happen if the medical examiner dies before trial?" and "Is the Confrontation Clause 'effectively' to function 'as a statute of limitations for murder'?" *See Williams*, 132 S.Ct. at 2251 (J. Breyer, concurring) (citing *Melendez-Diaz*, 129 S.Ct. 2527 (Kennedy, J., dissenting) (quoting Comment, Toward a Definition of "Testimonial": How Autopsy Reports Do Not Embody the Qualities of a Testimonial Statement, 96 Cal. L. Rev. 1093, 1115 (2008))).

G. Motions for Mistrial

Appellant challenges the trial court's denial of three motions for mistrial, two predicated on alleged prosecutorial misconduct and the third on an improper comment from a witness that allegedly violated appellant's right to remain silent. The State responds that there was no manifest necessity to declare a mistrial on any of the three occasions. We agree with the State.

A trial court may declare a mistrial if it appears that some matter has occurred which would prevent the jury from reaching an impartial verdict. *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). A trial court should only declare a mistrial in criminal cases where a manifest necessity requires such action. *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). A mistrial is appropriate when a trial cannot continue or a miscarriage of justice would result if it did continue. *State v. McPherson*, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). This court will review the trial court's decision to grant or deny a mistrial for abuse of discretion. *See State v. Hall*, 976 S.W.2d 121, 147 (Tenn. 1998) (citing *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990)). The party requesting the mistrial bears the burden of establishing the necessity for it. *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

1. Prosecutorial Misconduct

Appellant cites two occasions when he moved for a mistrial based on the allegedly improper conduct of the prosecutor. On the first occasion, appellant accuses the prosecutor of eliciting evidence of appellant's prior bad acts without first requesting a hearing under Tennessee Rule of Evidence 404(b). The following exchange occurred during Penny Cox's testimony:

PROSECUTOR: [L]et's talk about . . . the first time that you go over to [appellant]'s house, the first time that you meet him.
Can you explain that to us?

MS. COX: Well, we went over there, and we smoked crack.

PROSECUTOR: Okay. When you say "we," who is "we?"

MS. COX: John and Gary. He didn't smoke, but he was there.

DEFENSE COUNSEL:    May we approach, Your Honor?

MS. COX:                And Thomas Hutchison.

The trial court held a bench conference, during which defense counsel objected to the State's not following the procedure outlined in Tennessee Rule of Evidence 404. The prosecutor responded that Ms. Cox had not yet said appellant had smoked crack but that she likely would. The prosecutor argued that appellant's smoking crack showed how he knew the people involved in this case. The trial court held a jury-out hearing to allow the State to proffer Ms. Cox's testimony. Subsequently, the trial court ruled that Ms. Cox could testify about smoking crack cocaine with appellant after the victim's death and issued a jury instruction for the jury to disregard Ms. Cox's statement, "We smoked."

Appellant also claims that the prosecutor acted improperly during Ms. Cox's testimony when defense counsel objected to leading, and the prosecutor stated, "I can not lead, and she could say what she knows." Appellant alleges that the implication of the prosecutor's statement is that the defense was hiding evidence from the jury. The trial court issued a curative instruction that comments by counsel were not evidence.

When reviewing allegations of prosecutorial misconduct, this court must review the record to determine "whether such conduct could have affected the verdict to the prejudice of the defendant." *State v. Smith*, 803 S.W.2d 709, 710 (Tenn. Crim. App. 1990). "[P]rosecutorial misconduct does not amount to reversible error absent a showing that it has affected the outcome of the case to the prejudice of the defendant." *State v. Reid*, 164 S.W.3d 286, 321 (Tenn. 2005). Our supreme court has outlined the following factors to consider when making such a determination:

> (1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the [c]ourt and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case.

*State v. Buck*, 670 S.W.2d 600, 609 (Tenn. 1984) (quoting *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)).

In both of these instances, the trial court issued curative instructions to the jury, instructions which we presume the jury followed. *See State v. Vanzant*, 659 S.W.2d 816, 819 (Tenn. Crim. App. 1983). In the first instance, when Ms. Cox mentioned that appellant smoked crack with her the first day she met him, we fail to see how, in the context of the

case, the prosecutor's conduct in eliciting the comment amounted to reversible error. We agree that the prosecutor should not have asked Ms. Cox to elaborate with regard to who had been smoking crack cocaine at that juncture without a Rule 404(b) hearing, but it was all but inevitable that the jury would hear that appellant smoked crack cocaine at some point. There has been no indication that the prosecutor had malicious intent. We conclude that the prosecutor's conduct did not amount to reversible error nor did it create a manifest necessity to declare a mistrial.

As for the second instance, the trial court saw fit to issue a curative instruction when asked to do so by appellant but not to declare a mistrial. Appellant suggests that the prosecutor's statement implied that appellant was hiding information from the jury, but on the cold, written record we have on appeal, we are unable to either agree or disagree with appellant's deduction as to the prosecutor's meaning. Therefore, we must defer to the decision of the trial court, which was in a much better position to interpret the prosecutor's meaning. Based on the record before us, we must conclude that there was no manifest necessity to declare a mistrial.

### 2. Alleged Violation of Fifth Amendment Right to Remain Silent

Appellant moved for a mistrial during Investigator Murray's testimony predicated on the witness's saying that he asked appellant whether he wanted to give a statement and read appellant's rights to him. Investigator Murray did not say that appellant refused to give a statement because either the prosecutor or the court (it is unclear from the transcript) interrupted him.

It is fundamental that the State cannot use a defendant's post-arrest silence against him, with certain exceptions that do not apply to this case. *See Doyle v. Ohio*, 426 U.S. 610, 617-19 (1976); *Miranda v. Arizona*, 384 U.S. 436, 468 n.37 (1966) ("[I]t is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. The prosecution may not, therefore, use at trial the fact that he stood mute or claimed his privilege in the face of accusation."). In this case, while Investigator Murray nearly crossed the line, the fact remains that he never said that appellant invoked his right to remain silent. Moreover, the trial court issued a curative instruction to the jury that it should disregard both the prosecutor's question that led to Investigator Murray's answer and his answer. Again, we apply the presumption that the jury followed the trial court's instruction. *See Vanzant*, 659 S.W.2d at 819. Under these circumstances, we conclude that the trial court did not abuse its discretion by denying appellant's motion for mistrial because there was no manifest necessity.

## H. Denial of Request for Continuance

Appellant argues that the trial court should have granted him a continuance on the morning of the first day of his trial based on the prosecution's late disclosure of photographs of appellant's clothing. The State responds that appellant has failed to demonstrate actual prejudice from the denial of the request for continuance. We agree with the State.

The record in this case reflects that just before trial, appellant requested from the State any photographs taken by the TBI. The State contacted the TBI, and Agent Keith Proctor sent the State two photographs, which it then sent to appellant. The photographs were of appellant's clothing that had been tested by the TBI, specifically a jacket and shirt. Appellant stated that he received the photographs the Friday prior to the first day of trial. He requested a continuance to be allowed to examine the photographs and explore who made the photographs and when the photographs were made, among other inquiries. The trial court denied his request.

The decision to grant or deny a continuance is a matter left to the discretion of the trial judge, whose decision will not be disturbed absent a showing of abuse of discretion to the defendant's prejudice. *State v. Odom*, 137 S.W.3d 572, 589 (Tenn. 2004) (citing *State v. Hines*, 919 S.W.2d 573, 579 (Tenn. 1995)). "An abuse of discretion requires a showing that the denial of a continuance denied the defendant a fair trial or that the result of the trial would have been different." *Id.* In this case, appellant has not demonstrated that the denial of the continuance prejudiced him to the extent that he was denied a fair trial or that he would have received a different result otherwise. Appellant had the opportunity to thoroughly cross-examine the TBI agent responsible for testing the items of clothing depicted in the photographs. Moreover, appellant has not asserted that he would have discovered any additional information about the photographs had he been granted a continuance. Therefore, we conclude that the trial court did not abuse its discretion in denying appellant's request for a continuance.

## I. Denial of Motion to Strike Penny Cox's Testimony

Appellant contends that the trial court erred by denying his motion to strike Penny Cox's testimony. Appellant claims that Ms. Cox's testimony was inconsistent to the point that it was incompetent. The State responds that appellant was allowed to impeach Ms. Cox with her inconsistencies and that any inconsistencies did not require striking her testimony.

During Ms. Cox's testimony, the trial court held a Rule 404(b) hearing. *See* Tenn. R. Evid. 404(b). In that jury-out hearing, Ms. Cox stated that appellant discussed robbing the victim on the second day that she was at his house, but she later stated that it was the third

day she was there. She insisted that she was nervous and confirmed that the discussion happened on the third day. Appellant moved to strike her testimony based on the inconsistency of her testimony. The trial court denied the motion, and appellant was allowed to impeach her with her inconsistent statements.

"The purpose of a motion to strike evidence is to exclude incompetent evidence from the record and consideration by the trier of fact." *State v. Melvin*, 913 S.W.2d 195, 200 (Tenn. Crim. App. 1995). The movant may request the exclusion of an item of evidence, part of a witness's testimony, or a witness's entire testimony. *Id*. We review the trial court's decision for abuse of discretion. *Id*.

Appellant relies on the "rule of cancellation" to assert that Ms. Cox's testimony should have been stricken. Tennessee law holds that "contradictory statements by a witness in connection with the same fact cancel each other." *State v. Matthews*, 888 S.W.2d 446, 449 (Tenn. Crim. App. 1993) (citing *Taylor v. Nashville Banner Pub. Co.*, 573 S.W.2d 476, 482 (Tenn. Ct. App. 1978)). However, the "rule of cancellation applies only when inconsistency in a witness's testimony is unexplained and when *neither* version of his testimony is corroborated by other evidence." *Id.* (citing *Taylor*, 573 S.W.2d at 483) (emphasis added). "The testimony of a witness as to a particular fact may have value even though he has both affirmed and denied it if the contradiction is explained and is shown to have been the result of misunderstanding or inadvertence." *Johnston v. Cincinnati, N. O. & T. P. Ry. Co.*, 146 Tenn. 135, 240 S.W. 429, 435 (1922).

Ms. Cox explained that she misspoke because she was nervous and affirmed that appellant told her of his plan to rob the victim on the third day of her stay at his house. This appears to be the type of inadvertent mistake comprehended by our supreme court in *Johnston*. In any event, the rule of cancellation would apply only to the specific facts about which Ms. Cox testified inconsistently, not the entirety of her testimony. The trial court did not abuse its discretion by denying appellant's motion to strike.

### J. Autopsy Photographs

Appellant argues for the first time on appeal that the trial court erred by admitting the autopsy photographs. He specifically complains that the jury's "prolonged exposure" to the photographs during Dr. Mileusnic-Polchan's testimony was unnecessary as the fact and cause of the victim's death and his injuries had been established by other witnesses. The State responds that appellant has waived review of this issue for failing to object to the admission of the photographs at trial. We agree with the State. Appellant did not lodge an objection to the photographs and has thus waived appellate review of this claim. *See* Tenn. R. App. P. 36(a); Tenn. R. Evid. 103(a)(1).

### K. Jury Instruction that Witnesses Are Presumed to Tell the Truth

Appellant argues that the trial court's instructing the jury that witnesses are presumed to tell the truth infringed on his right to remain silent and was an improper comment on the evidence by the trial court. He is especially concerned that the presumption endorses the credibility of Ms. Cox's and Mr. Mitchell's testimonies. The State replies that courts of this state and the United States Supreme Court have allowed such jury instructions and that application of the controlling authority renders appellant's argument meritless. We agree with the State.

In *Cupp v. Naughton*, the United States Supreme Court ruled that a jury instruction that all witnesses were presumed truthful did not violate the Due Process Clause of the Fourteenth Amendment when the jury was also "instructed to consider the manner of the witness, the nature of the testimony, and any other matter relating to the witness' possible motivation to speak falsely" and "was charged fully and explicitly about the presumption of innocence and the State's duty to prove guilt beyond a reasonable doubt." 414 U.S. 141, 149 (1973). The Court reasoned that such instructions allowed the jury to "remain[] free to exercise its collective judgment to reject what it did not find trustworthy or plausible." *Id.* Moreover, such instructions did not place undue pressure on an accused to take the witness stand or to call witnesses. *Id.* Likewise, this court in *Lundy v. State* applied *Cupp* to a similar instruction in Tennessee and concluded that the jury charge taken as a whole, including the presumption of truthfulness, was constitutionally sound. 752 S.W.2d 98, 103 (Tenn. Crim. App. 1987).

In this case, the trial court thoroughly instructed the jury on the presumption of innocence applied to appellant and the State's burden to prove his guilt beyond a reasonable doubt. The trial court also instructed the jury that while the law presumed that witnesses testified truthfully, it was the jury's prerogative to reconcile conflicts in witnesses' testimonies and to decide whom they believed. The trial court also provided factors for the jury to consider when weighing a witness's credibility, including the witness's motives, mannerisms while on the stand, and whether the witness was in a position to know about the matter to which he or she was testifying. These jury instructions "acknowledg[ed] that a witness could be discredited by his own manner or words," and therefore, "the instruction freed [appellant] from any undue pressure to take the witness stand himself or to call witnesses under the belief that only positive testimony could engender disbelief of the State's witnesses." *See Cupp*, 414 U.S. at 149. We conclude that appellant's claim is without merit.

## L. Sufficiency of the Evidence

Appellant contends that the evidence was insufficient to support his convictions for facilitation of first degree murder and facilitation of especially aggravated robbery because there was no evidence that he substantially assisted another person who committed murder and especially aggravated robbery, which is a required element of facilitation. In addition, he argues that the trial court should have granted his motion for a judgment of acquittal with regard to the especially aggravated robbery charge because there was no proof of a robbery. The State responds that there was sufficient evidence for the jury to determine that an unknown and unindicted person committed the murder and especially aggravated robbery, substantially assisted by appellant.

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977). A motion for judgment of acquittal raises a question of law, i.e., the legal sufficiency of the evidence, for determination by the trial court. *State v. Adams*, 916 S.W.2d 471, 473 (Tenn. Crim. App. 1995) (citing *State v. Hall*, 656 S.W.2d 60, 61 (Tenn. Crim. App.1983)). Thus, on appeal, this court applies the same standard of review both to the trial court's denial of a motion for a judgment of acquittal and to the sufficiency of the convicting evidence underlying the jury's verdict. *State v. Carroll*, 36 S.W.3d 854, 869 (Tenn. Crim. App. 1999) (citing *State v. Ball*, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998)).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts

in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

In order to support appellant's convictions for facilitation, the State had to prove beyond a reasonable doubt that "the accused (a) knew another person was going to commit a specified felony and (b) knowingly furnished substantial assistance in the commission of the felony although the accused did not possess the requisite intent to be guilty of the felony." *State v. Parker*, 932 S.W.2d 945, 950-51 (Tenn. Crim. App. 1996); *see also* Tenn. Code Ann. 39-11-403(a). Appellant was convicted of facilitating first degree murder under alternate theories of premeditation and felony murder and of facilitating especially aggravated robbery. Under the theory of premeditated murder, the State would have had to show that "the intent to kill [was] formed prior to the act itself." *See* Tenn. Code Ann. § 39-13-202(d). For the felony murder counts, the State had to establish that the victim was killed in the course of a robbery or theft. Finally, the State had to demonstrate that the person to whom appellant provided substantial assistance was culpable of especially aggravated robbery, which is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear" that is "[a]ccomplished with a deadly weapon[ ] and [w]here the victim suffers serious bodily injury." Tenn. Code Ann. §§ 39-13-401, -403. In addition, to survive the motion for judgment of acquittal with regard to the especially aggravated robbery charge, the proof had to be sufficient that appellant was responsible for especially aggravated robbery as we have just defined it.

Appellant contends that there was no evidence that another person was involved in the victim's death and that there was no evidence of a robbery. However, viewed in the light most favorable to the State, the evidence revealed at trial was sufficient to support appellant's convictions. Regarding whether the victim was robbed, the testimony indicated that the victim typically wore two rings on one hand, but he was only wearing one ring when the police found him. A gold ring, identified by John Mitchell as belonging to the victim, was found in an adjacent bathroom. Moreover, according to Mr. Mitchell's testimony, the victim had at least $2000 in cash on his person prior to his death. Appellant had money after the victim's death that he did not have before. Ms. Cox also had a sum of money after the victim's death, the origin of which was unclear from the testimony. She claimed she had received a tax return, but according to one witness, Ms. Cox did not work. In any event, most of the victim's $2000 was unaccounted for as the police did not testify that appellant

had that much currency when he was arrested. Thus, the facts established that an especially aggravated robbery occurred. This evidence was sufficient to support the trial court's denial of appellant's motion for judgment of acquittal. The State's evidence also established both premeditated murder and felony murder, considering that appellant expressed to Ms. Cox his plan to rob the victim, his luring the victim into his home to conduct a drug sale, with no evidence of a buyer, and the aforementioned facts supporting the especially aggravated robbery of the victim.

The central issue is whether the facts support that appellant knew someone was going to kill and rob the victim and that appellant substantially assisted said person. Appellant's foreknowledge is supported by the same facts supporting premeditation: appellant had a plan to rob the victim and lured the victim into his house on the pretext that they would conduct a drug sale with a third party. Several facts also support appellant's assistance of the principal actor, rather than his direct participation. Ms. Cox was in the house during the offenses, and although she told the police that she had not changed clothes since the murder, Ms. Armas-Trejos testified that Ms. Cox was wearing different clothes when she picked her up than when Ms. Cox was at the police station. Mr. Mitchell testified that appellant said, "I didn't do it by myself." The clear implication is that another person was involved in the offenses. In addition, while appellant had some of the victim's blood on his clothing, near his ankles, and on his fingers, the amount of blood was not necessarily what one would expect considering the massive trauma received by the victim. There is also the issue of who had the victim's missing $2000. While there is no direct proof that another person was involved, a jury could have found the existence of a culpable party based on this circumstantial evidence. Therefore, we conclude that any rational jury could have found appellant guilty of facilitating first degree murder and facilitating especially aggravated robbery.

### M. Cumulative Error

Appellant argues that he is entitled to a new trial due to cumulative errors throughout his trial. However, he has only shown two errors, both of which we deemed harmless. Therefore, we conclude that he is not entitled to a new trial on this basis.

### CONCLUSION

Based on our review of the record, the parties' arguments, and the applicable law, we affirm the judgments of the trial court.

_____

ROGER A. PAGE, JUDGE

-47-